[No. S023628. July 31, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN SAPP, Defendant and Appellant.

**COUNSEL**

Bruce Eric Cohen, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Dane R. Gillette, Stan M. Helfman and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—A jury convicted defendant John Sapp of the first degree murders of Robert Weber, Elizabeth Duarte, and John Abono. (Pen. Code, § 187; further undesignated statutory references are to the Penal Code.) For each murder, the jury found that defendant personally used a firearm. (§ 12022.5.) With respect to the murders of Weber and Duarte, the jury further found to be true special circumstance allegations of multiple murder and murder for financial gain. (§ 190.2, subd. (a)(1), (3).) In addition, the jury found defendant to be a convicted felon in possession of a concealable firearm (§ 12021), and it found true an allegation that defendant had served a prior prison term (§ 667.5, subd. (b)).

At the penalty phase, the jury returned verdicts of death for the Weber and Duarte murders, and the trial court pronounced death sentences for those crimes. For being a convicted felon in possession of a concealable firearm, the court sentenced defendant to two years plus a one-year sentence enhancement.

This appeal is automatic. (§ 1239.) We affirm the judgment in full.

## I. GUILT PHASE

### A. *Prosecution's Case*

On April 25, 1986, in Grass Valley, Nevada County, California, defendant was arrested on an outstanding warrant for being a felon in possession of a concealable firearm. The next day, defendant confessed to three unsolved murders in California: the 1985 murder of Robert Weber in Colusa County, the 1981 murder of Elizabeth Duarte, and the 1975 murder of John Abono, both in Contra Costa County.

### 1. *Murder of Robert Weber*

In August 1985, defendant's friend Robert Weber lived in Concord. He was a "minor scale" cocaine dealer who was in debt to other drug dealers, including defendant. On August 13, Weber told his girlfriend, Linda Brown, that he and defendant were leaving for a few days to buy drugs. Weber took with him $17,000, a sawed-off shotgun, and a nine-millimeter semiautomatic handgun. Around 7:00 o'clock that evening, Weber telephoned Brown and told her he was in the town of Clearlake with defendant but that the people they were planning to meet had not shown up.

On August 17, 1985, defendant and an armed companion went to Weber's condominium. While there, defendant answered a telephone call from Brown,

who asked about Weber. Defendant told her he had waited for Weber in a motel for three days but that Weber never showed up. (Actually, defendant and Weber had stayed at the El Grande motel in Clearlake the nights of August 13 and 14.)

On August 18, two deer hunters found a man's body, later identified as Weber's, on a hillside on Walker Ridge in Colusa County, about 18 miles from Clearlake. Sheriff's deputies summoned to the scene found bloodstains and four expended 9-millimeter casings a short distance from Weber's body. Weber had died of multiple gunshot wounds to the head, back, chest, throat and both arms. He had been dead at least 24 hours when the hunters discovered his body.

While in custody some eight months later in Nevada County, after his arrest on the warrant for being a felon in possession of a concealable firearm, defendant discussed the Weber killing with Deputy Steven McCulloch of the Colusa County Sheriff's Department. Defendant led McCulloch to the site at Walker Ridge where he had killed Weber. Defendant mentioned that Weber was walking in front of him on top of a hill, and when Weber turned around, defendant shot him several times with a 9-millimeter pistol. Defendant then dragged Weber's body some distance and rolled it over the side of the hill, noting that shrubbery stopped it from rolling farther down the hill.

The area was the same location where, earlier in August 1985, hunters had discovered the body, and sheriff's deputies had found bloodstains and expended 9-millimeter casings.

Defendant denied that Weber had any money on him when killed. According to defendant, "It was murder for hire." Defendant said that some people, whom he refused to name, had paid him $10,000 in advance to kill Weber, and defendant then devised a bogus drug deal to lure Weber to the remote area outside Clearlake.

In December 1986, while awaiting trial in this case, defendant wrote to Weber's brother Michael: "Thought I'd write you one and only letter to let you know something that's been eating away at me since your brother's death. It's obvious who pulled the trigger. I'm curious if you ever think about who put the 'thing' in motion or who put up the 'money' to have it done. Those people are still out there just like you are. Your brother died being a good friend of mine. He owed me $32,000 but that's not the reason he died. You're probably relieved about my situation but you should still keep in mind the other 'responsibles' involved besides myself. I was used as a 'tool' and nothing else. . . . I'm certainly not innocent of many things that I've been accused of but concerning your brother I was only a 'tool' used by the 'other

people.' After I'm executed or if I am executed those 'other people' will still be out there. Sometimes I wish they would be executed right along side of me. They deserve it also in my opinion."

### 2. *Murder of Elizabeth Duarte*

In 1976, defendant worked at Chevron Research in Richmond, Contra Costa County, where he met coworker Elizabeth Duarte. The two dated for several years, but in July 1980, Duarte obtained a restraining order against defendant. Around the same time, she began dating another coworker, James Luddon.

Late in the evening of January 24, 1981, Duarte's father came to her house in Richmond and picked up her five-year-old son. Duarte's father brought the child back the next morning, but Duarte was not there. Later that day, the father notified the Richmond police that his daughter was missing.

On January 26, Richmond police investigator Patricia McKittrick talked with defendant about Duarte's disappearance. When defendant asked if he was suspected of murder, McKittrick told him "no." Defendant volunteered that Duarte made him "so mad" he wanted "to kill her." According to defendant, on January 24 (when Duarte disappeared), he had gone fishing, and he did not return until the next day. At the end of the interview, defendant said: "If I am not a suspect, I ought to be; I had a dream the other night that [Duarte] got shot in the head."

Police obtained a warrant and searched defendant's van on February 1, 1981. Caked dirt was on its clutch, gas and brake pedals, and dried human blood consistent with Duarte's (type A) was on the floor.

After his arrest in Nevada County in April 1986, defendant discussed Duarte's murder with Richmond Detective Michael Tye. Defendant said that he and Duarte had a "love-hate" relationship. He decided "to get rid of her because the love-hate was not balancing out anymore," and only hate was left. Although defendant decided to kill Duarte for personal reasons (she had arranged for a hit man to shoot 20 rounds from a high-powered rifle at his house), he did not do so for some two months after making that decision. In the meantime, someone offered him $20,000 to kill Duarte because she was a snitch.

For $800, defendant had James Luddon, whom Duarte dated after breaking up with defendant, lure her to Luddon's house.

On the evening of January 24, 1981, when Duarte arrived at Luddon's house, defendant was waiting in a bathroom. Defendant stepped into the hall

and hit Duarte in the head so hard it split her scalp wide open, exposing skull bone. Defendant took Duarte in his van to his house, where he wrapped a bandage around her head and gave her a blanket. The two then drove to the Lime Ridge area of Mount Diablo, where defendant had earlier dug a grave. They talked all night and defendant at one point handed Duarte his .38-caliber revolver, telling her to shoot him. Just as the sun was coming up, defendant shot Duarte once in the stomach. She told him to shoot her again, and he "emptied the gun into her." Defendant added that he had buried Duarte wrapped in the blanket.

On April 27, 1986, defendant led Detective Tye to the area of Duarte's killing. There, police recovered human remains wrapped in a blanket and with a bandage wrapped around the skull. Several .38-caliber bullets were found nearby. Dental records established that the remains were those of Elizabeth Duarte. She had been shot in the chest at least four times.

### 3. *Murder of John Abono*

On December 22, 1975, 22-year-old John Abono was living in Concord, Contra Costa County. In the late afternoon, Abono and his friend Tim Bowler went to buy some marijuana from defendant, a longtime friend of Abono's. Bowler had given Abono $200 to $300 to buy two pounds of marijuana. Abono drove by defendant's house, and pointed it out to Bowler, who did not know defendant. Bowler noticed a Volkswagen parked in front. Abono, who was driving, parked his sports car nearby. Bowler got out of the car and walked home, leaving Abono to buy the drugs.

That evening, after waiting in vain for Abono and the marijuana, Bowler drove by defendant's house several times. When Bowler drove by between 7:00 and 8:00 p.m. and again around 11:00 p.m., he noticed that the Volkswagen was gone but that Abono's car was still parked on the street.

Shortly after Abono's disappearance, Concord Police Officer Richard Berendsen talked to defendant. Defendant said he knew he was suspected of killing Abono because Abono had once "snitched" on him. Defendant claimed, however, that Abono had "simply left town" out of fear of defendant, and that Abono would eventually come back.

After his April 1986 arrest for being a felon in possession of a concealable firearm, defendant spoke with Concord Police Officer Jim Webster about killing Abono some 10 years earlier. Defendant and Abono had been close friends for many years, but defendant became annoyed with Abono over "bad dope deals." Defendant explained: "[Abono] put me in a situation of messing with heroin dealers. Just bad business. He was doing too many bad drug

deals. He was lying. . . . [and] a heroin addict." So defendant decided to kill him and did so "within a few days."

Defendant gave these details of the murder: Defendant met Abono to transact a marijuana purchase. Abono appeared to be high on heroin. Defendant put a gun to Abono's head and took him to an area near Castle Rock on Mount Diablo, Contra Costa County. He made Abono walk for about 45 minutes to an isolated area. Defendant then shot him several times in the head. Initially, defendant covered Abono's body with brush, but he later returned with a shovel and buried the body.

The area where defendant killed Abono was not too far from where he later killed and buried Elizabeth Duarte. Defendant directed police officers to the area of Abono's killing, but they did not find Abono's body.

## B. *Defense Case*

To support a defense that defendant tends to falsely confess to crimes he did not commit and therefore that his confessions in this case could not be believed, defendant called Contra Costa County Deputy District Attorney Lawrence Barnes as a witness. Barnes testified that while defendant was awaiting trial in this case defendant admitted killing one Roger Gardner. Counsel for the prosecution and the defense stipulated that Barnes was an "expert in judging the credibility of witnesses." Barnes thereafter gave his opinion that defendant's confession to killing Gardner was false, and that the actual killer was Larry Leroy Brownson, whom Barnes had prosecuted for the crime in 1986 and 1987.

To show that he had killed Elizabeth Duarte for personal reasons—after she had a hit man shoot at him—defendant called Thomas Pompileo, who in 1980 had been his next-door neighbor. Pompileo described an incident in which Elizabeth Duarte visited defendant and left after a loud argument. Shortly thereafter, a man standing on the freeway fired several shots from a high-powered rifle in the direction of defendant's house.

## II. PENALTY PHASE

## A. *Prosecution's Case*

The prosecution presented evidence of defendant's 1981 felony conviction for recklessly setting fire to an inhabited dwelling, and of five unadjudicated crimes. These crimes were defendant's possession in 1971 (at age 18) of a sawed-off shotgun; his possession in 1986, while in jail awaiting trial in this

case, of a homemade knife or shank; the 1985 murder of defendant's mother, Geraldine Sapp; and the attempted murders of Al Redenius in 1983 and of Donna Smith in 1986.

### 1. Attempted murder of Al Redenius

Shortly after 9:00 o'clock on the morning of November 9, 1983, Redenius was outside his house in Willits, Mendocino County, when he was shot in the face, neck, and hip from a shotgun fired from a car occupied by Brian Magidson, Herb Powell and a third man. Earlier that morning, Dave Clement had seen defendant at Magidson's house with Magidson and Powell. In April 1986, when defendant was arrested for being a felon in possession of a concealable firearm, he told the police that he was paid $10,000 to kill Redenius and that he had fired three shotgun blasts at Redenius, hitting him in the face.

### 2. Murder of Geraldine Sapp and attempted murder of Donna Smith

We discuss these two unadjudicated crimes in the course of certain penalty phase issues. (See pts. VI.B.1. & C., *post*.)

### B. Defense Case

Through many witnesses, the defense presented evidence of defendant's difficult childhood, including pathological behavior by his mother, Geraldine Sapp; his devotion and helpfulness to friends and relatives, particularly to his son Richard; and his extreme and chronic substance abuse dating from his early teens. Mental health professionals testified that defendant showed signs of organic brain damage and brain dysfunction. Defendant's son Richard, who at the time of defendant's trial was 20 and confined at the California Youth Authority for car theft, asked the jurors to spare his father's life. Raymond Procunier, the former Director of the California Department of Corrections, who for 40 years had worked in various penal systems, interviewed defendant and concluded that he would make a good "life" prisoner. Procunier said: "[Defendant] is willing to take his medicine, and I would have confidence if I were a warden that he [would] behave himself and do what he is supposed to do and accept whatever came down on him if he didn't and not cause me any problems."

## III. PRETRIAL ISSUES

### A. Withdrawal and Appointment of Counsel

Trial in defendant's capital case was scheduled to start on February 14, 1989, in Contra Costa Superior Court before Judge Norman Spellberg. At that

time, defendant's counsel of record was the Contra Costa County Public Defender, Charles James, who had been appointed in May 1986.

On January 30, 1989, Public Defender James filed an affidavit of conflict, stating that his office "refuses to represent defendant because of a conflict of interest." On February 1, James appeared before Judge Spellberg and reasserted the existence of a conflict. But the deputy public defender assigned to the case, who was also present in court, said there was no conflict, and he asked the court to let him continue as defendant's attorney. When the court asked defendant for his view, defendant replied: "I would like to keep [the deputy] as my attorney at this point." The court denied the deputy's request, giving these reasons: "The Public Defender is Mr. James. He has conflicted in this matter. And if he conflicts, there is no appropriate basis for you [the deputy] to insist that you remain as [defendant's] attorney." The deputy, citing *Harris v. Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750] (*Harris*), insisted that defendant was entitled to a hearing on the request that the assigned deputy remain his counsel. The deputy added that he would take a leave of absence from the public defender's office if necessary to continue as defendant's attorney.

The trial court ruled that because of the declared conflict, "the [Office of the Contra Costa County] Public Defender no longer represents [defendant]." It appointed Attorney Stephen Houghton as counsel for defendant regarding the issues raised by the public defender's declaration of a conflict. And it set a hearing for February 3, 1989, to consider both the possibility of defendant's waiver of the asserted conflict and defendant's motion for appointment of the deputy to represent him as private counsel after leaving the public defender's office.

Before the February 3 hearing date, the prosecution filed a brief asserting that defendant had a right to know the basis for the public defender's conflict. Defendant too filed a brief, citing *Harris, supra*, 19 Cal.3d 786, 140 Cal.Rptr. 318, 567 P.2d 750, as authority for the trial court to appoint as private counsel the deputy (who had offered to leave the public defender's office) because of the "special relationship" defendant had formed with him during the two-year period that the deputy had been assigned to work on this case. On February 3, Judge Spellberg transferred the attorney conflict matter to Superior Court Judge Michael Phelan.

Judge Phelan immediately convened an in camera hearing. Present were Public Defender James, defendant, and Attorney Houghton. The court excluded the prosecutor to protect defendant's attorney-client privilege. The court asked James why he had declared a conflict.

In response, James detailed numerous problems with his assigned deputy, including the following: Complaints by experienced investigators that the deputy had not adequately prepared the case for trial; James's own assessment that the deputy had not developed a coherent trial theory; and reports by former supervisors that he often had "outbursts of rage," followed by periods in which he seemed "catatonic, unable to perform his job at all." One former employer told James he was shocked that the deputy had been assigned a capital case, given his lengthy history of "mental health issues."

James also explained that on January 11, 1989, less than five weeks before the scheduled trial date, Rebecca Young, an attorney working as a law clerk and assisting on defendant's case, "walked off the job" after the assigned deputy screamed at her and threatened her with a hammer. Young told Public Defender James that the deputy had "blanched in the face, foamed in the mouth, [and] shook with rage." He then ran from the office into a parking lot, where he "yelled about the Sapp case at the top of his lungs in earshot of the District Attorney's office."

A few days thereafter, James received a letter from the private investigator firm most recently employed on defendant's case. The firm had experience in some 25 capital matters. The letter described defendant's case as being "in a state of basic shambles" and revealed that the firm's investigators had witnessed inappropriate outbursts and unprofessional conduct by the deputy, including a request for an investigator to impersonate a police officer when interviewing certain potential witnesses. When the investigators suggested that the deputy seemed unstable, he falsely accused them of unprofessional behavior and ordered them off the case.

Public Defender James explained to the trial court that just two weeks before the scheduled trial, he faced the following problems: The deputy had alienated everyone who was assisting him; left with "no investigator, no support staff," he was inadequately prepared to go to trial. James called the deputy into his office and told him he was considering declaring a conflict. The deputy responded by cupping his hands over his ears and running from the office. After discussing the problem "in the abstract" with current and former public defenders of other counties and with the president of the California Public Defenders Association, James concluded that he had no choice but to declare a conflict.

Public Defender James added that although defendant wanted the deputy to continue to represent him, defendant had previously complained about the deputy. James mentioned that in January 1988, defendant wrote to James requesting that his case be assigned to a different deputy public defender.

Defendant had stated that the assigned deputy did not have defendant's interest at heart, and that there was no longer an attorney-client relationship. Defendant wanted to have psychological issues explored but the deputy had not arranged for any psychological or psychiatric evaluation. In response to defendant's letter, James met with defendant and persuaded him that the assigned deputy was an excellent lawyer and should remain on the case. But a year later, defendant telephoned the deputy's assistant, Rebecca Young, and again expressed dissatisfaction with his representation. When Young mentioned this to the deputy, he told her not to have further contact with defendant.

The trial court then took a recess so Attorney Houghton could confer with defendant. Thereafter, the hearing resumed in open court. Houghton stated that he had discussed with defendant "all aspects of the—the allegations, and instances of the behavior chronicled by Mr. James," but that defendant still wanted the deputy to represent him and therefore asked to "execute the appropriate waivers" so the court could appoint the deputy as private counsel to represent defendant.

The trial court ruled that notwithstanding Public Defender James's declaration of a conflict of interest, "this is not factually a conflict of interest case." Rather, as the court characterized it, defendant's appointed counsel, Public Defender James, had "represented to the court that [his] assigned deputy is incapable of competently handling this case at trial." The court expressed "grave misgivings" whether a defendant could waive the right to competent appointed counsel, and it found that the criteria of *Harris, supra,* 19 Cal.3d 786, had not been satisfied. It then vacated the public defender's appointment as counsel of record and denied defendant's request for appointment of the deputy as private counsel to represent defendant.

Trial in defendant's case did not begin until some two years later, in January 1991. At trial, defendant was represented by private attorneys Stephen Houghton and Marlene Weinstein. Assisting them was Rebecca Young, who had left the public defender's office and was working as a private attorney.

Defendant now contends that the rulings by Judges Spellberg and Phelan denied him the right to counsel. Specifically, defendant argues that he should have been permitted to waive any conflict of interest preventing representation either by the public defender's office or by the deputy who was taken off this case, who by taking a leave from the public defender's office could have represented defendant as private counsel. Defendant further asserts that once the trial court vacated the public defender's appointment as counsel of record, defendant's "special relationship" with the assigned deputy public defender

entitled *him* to have that attorney appointed as his counsel of record. (*Harris, supra,* 19 Cal.3d 786.) We are not persuaded.

■ A criminal defendant's right to counsel is guaranteed by both the federal Constitution's Sixth Amendment (applicable to the states through the Fourteenth Amendment), and by California Constitution article I, section 15. The essential aim "is to guarantee 'an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.' " (*People v. Bonin* (1989) 47 Cal.3d 808, 834 [254 Cal.Rptr. 298, 765 P.2d 460], quoting *Wheat v. United States* (1988) 486 U.S. 153, 159 [100 L.Ed.2d 140, 108 S.Ct. 1692].) Questions of appointment and removal of counsel, at least when counsel seeks to withdraw, are addressed to the trial court's sound discretion. (*People v. Daniels* (1991) 52 Cal.3d 815, 846 [277 Cal.Rptr. 122, 802 P.2d 906]; *Drumgo v. Superior Court* (1973) 8 Cal.3d 930, 934–935 [106 Cal.Rptr. 631, 506 P.2d 1007].)

Here, defendant's counsel of record was Contra Costa County Public Defender James. (See 59 Ops.Cal.Atty.Gen. 27 (1976) ["In cases handled by the public defender's office, it is the officeholder who is the attorney of record."].) As public defender, James had the authority to assign any of his deputies to represent defendant in this case (see *Mowrer v. Superior Court* (1969) 3 Cal.App.3d 223, 231 [83 Cal.Rptr. 125]) and also to seek his own removal from the case (Code Civ. Proc., § 284). James asked the trial court to allow him to withdraw from defendant's capital case based upon his evaluation that his assigned deputy was unprepared for the upcoming capital trial, for the reasons we discussed earlier in detail. Because of the extraordinary circumstances surrounding the matter, the trial court did not abuse its discretion in allowing Public Defender James to withdraw as counsel.

Defendant insists that our decision in *Harris, supra,* 19 Cal.3d 786, entitled him to continued representation by the assigned deputy public defender, who was willing to leave the public defender's office and accept appointment as private counsel in defendant's case. Under *Harris,* a trial court contemplating appointment of private counsel to represent a criminal defendant must take into account whether the defendant has a preexisting relationship with an attorney willing to accept appointment. (*Id.* at p. 799.) But even when such a relationship exists, *Harris* acknowledges that a trial court need not appoint that attorney when there are "countervailing considerations of comparable weight." (*Ibid.*) ■ Here, the facts described by Public Defender James at the in camera hearing raised serious concerns about his assigned deputy's ability to competently represent defendant, thus constituting the requisite countervailing considerations. Under these circumstances, defendant suffered no infringement of his constitutional right to counsel because the trial court refused to appoint the attorney as defendant's counsel.

Also of no assistance to defendant is *Smith v. Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65]. In that case, this court set aside a trial court's order removing a private attorney from the retrial of a capital case for purported incompetence. The attorney had successfully represented the defendant in his automatic appeal, securing a complete reversal. The trial court's removal of the attorney suggested not so much that the attorney lacked the ability to competently try the case as it did the existence of a personality conflict between the trial judge and the attorney. (*Id.* at pp. 557–558.) That is not the situation here.

Defendant points out that the assigned deputy was not present at the in camera hearing before Judge Phelan on February 3, 1989, and thus had no opportunity to counter the version of events described by Public Defender James. We note that on February 1, 1989, the deputy, represented by counsel, appeared before Judge Spellberg and argued that no conflict prevented defendant's representation by the office of the public defender, and alternatively, that the trial court should appoint him personally as private counsel to represent defendant. At that hearing and again on February 3, Judge Spellberg ruled that Public Defender James, not James's deputy, was defendant's attorney of record, and that the deputy therefore lacked standing to oppose James's motion to withdraw for a conflict of interest. When Judge Spellberg then transferred the matter to Judge Phelan, the deputy did not appear before Judge Phelan. Defendant, who was present and represented by counsel, raised no objection to Judge Phelan's deciding the matter without hearing from the deputy. On these facts, defendant cannot complain that his rights were violated.

B. *Motions to Sever Murder Counts*

■ Before trial, defendant twice sought separate trials on each of the three murder charges. The trial court denied those requests, and the same jury heard evidence of all three offenses in a single trial. Defendant contends that the joint trial of all three murder charges was fundamentally unfair, thus entitling him to reversal. We disagree.

Section 954, which governs joinder of counts in a single trial, provides: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." These statutory requirements for joinder were met here because the three murder counts were crimes "of the same class." (*People v. Mason* (1991) 52 Cal.3d 909, 933 [277 Cal.Rptr. 166, 802 P.2d 950].)[1] But section 954 also provides that "the court

---

[1] In June 1990, six months before the start of trial in this case, the California electorate enacted Proposition 115, an initiative measure that, as relevant here, changed the rules governing joinder and severance of criminal charges. (See Cal. Const., art. I, § 30; § 954.1.)

in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately." ▉ We review for abuse of discretion a trial court's decision not to try the offenses separately, that is, not to sever charges under this provision. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1120 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *People v. Mayfield* (1997) 14 Cal.4th 668, 720 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

" ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] . . . [¶] . . . Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

With respect to the first factor, defendant contends that if the three murder counts had been tried separately, evidence of the other two would not have been cross-admissible in any other trial because the crimes bore no common identifying characteristics and thus were not probative of any of the factors listed in Evidence Code section 1101, subdivision (b). But, as we explain, even if we assume that the standards for cross-admissibility in the prosecution's case-in-chief were not satisfied here (see *People v. Mason, supra,* 52 Cal.3d at p. 934), the evidence of the other two murders would have been cross-admissible on rebuttal in each other case if tried separately.

This rebuttal evidence would have shown that, with respect to each murder defendant confessed to, he knew the victim well (Abono was his best friend from high school; Duarte was his former girlfriend; Weber was a drug dealer with whom he did business). And evidence independent of defendant's confession linked him to each of the crimes (Abono was last seen going to buy drugs from defendant; when Duarte disappeared, police searched defendant's van and found caked mud and blood of her blood type; Weber left for a drug-buying trip with defendant days before his body was found). The evidence of the other murders, including defendant's confessions, would have been admissible to refute any contention that defendant frequently made false

Because the parties stipulated that those new provisions would not apply in this case, we do not consider them.

confessions to murders or, if defendant presented a mental-state defense, to refute any contention that premeditation and deliberation was absent from any murder. ▮ Accordingly, defendant suffered no prejudice from the trial court's denial of the severance motion.

Defendant argues that because Abono's body was never found, the evidence as to that murder case was relatively weaker than the evidence supporting the other two counts of murder. Thus, defendant contends, the trial court abused its discretion in not severing the Abono murder count from the other two murders. We are not persuaded. As just discussed, the Abono killing resembled the other two murders not only because defendant confessed to it, but also because Abono, like the other victims, was close to defendant. The circumstances of the Abono murder, therefore, satisfied the requirements for cross-admissibility to rebut the defense claim that defendant falsely confessed to the killings, thereby dispelling " 'any inference of prejudice.' " (*People v. Sandoval* (1992) 4 Cal.4th 155, 173 [14 Cal.Rptr.2d 342, 841 P.2d 862].)

As earlier explained, in determining whether a trial court abused its discretion in denying a severance motion, we consider whether a capital offense has been linked with a noncapital offense, and most particularly whether the linkage " 'turns the matter into a capital case.' " (*People v. Bradford, supra*, 15 Cal.4th at p. 1315.) Here, as defendant points out, he could not be sentenced to death for killing Abono because in 1975, when Abono was killed, there was no death penalty law in effect in California. Accordingly, defendant contends that trying that noncapital murder count with the two capital murder counts was an abuse of discretion by the trial court. We disagree.

Although the first degree murder conviction on the count involving Abono allowed the jury to find the existence of the multiple murder special circumstance (§ 190.2, subd. (a)(3) ["The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree"]), that conviction was not crucial to the multiple-murder special-circumstance finding. The jury in the same proceeding also returned first degree murder verdicts on the Duarte and Weber murder counts, both charged as capital offenses. ▮ These verdicts would, even if the same jury had not decided the charge involving Abono, have provided the basis for a true finding on the multiple-murder special-circumstance allegation. Accordingly, the trial court's decision to allow the jury in the same proceeding that involved the murders of Weber and Duarte to also decide the charge involving Abono did not result in any prejudice to defendant.

Having concluded that defendant suffered no prejudice from the joint trial of the three murder counts, we also reject his contention that the joint trial

violated his due process rights. (See *United States v. Lane* (1986) 474 U.S. 438, 446, fn. 8 [88 L.Ed.2d 814, 106 S.Ct. 725] ["Improper joinder does not, in itself, violate the Constitution" but rather "rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"]; *People v. Mendoza* (2000) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

C. *Failure to Bifurcate Trial on the Charge of Felon in Possession of a Concealable Firearm*

In addition to the three murder counts, defendant was convicted of a 1985 violation of section 12021. In 1985, that provision prohibited any person who had been convicted of a felony offense from possessing any "firearm capable of being concealed upon the person." (Stats. 1983, ch. 1092, § 326.5, p. 4062.) In July 1981, defendant had been convicted of the felony of recklessly burning an inhabited structure (§ 452, subd. (b)), the house of murder victim Duarte, who had disappeared in January of that same year.

Before trial, the defense moved to "bifurcate" the trial on the felon in possession of a firearm charge. Specifically, counsel stated that defendant was "prepared to . . . waive jury on that [charge] . . . and have the Court . . . out of the presence of the jury" decide it. The trial court, citing *People v. Valentine* (1986) 42 Cal.3d 170 [228 Cal.Rptr. 25, 720 P.2d 913] (*Valentine*), denied the request. It stated that the question of being a felon in possession of a firearm was for "the jury to determine," and that case law "has only given us one area where we can adjust that, . . . if there is a stipulation as to the defendant's status as an ex-felon, then the *nature* of the particular felony can be withheld from the jury." Defendant thereafter agreed to stipulate that he had been convicted of a felony, and he asked the court "to sanitize" the felon-in-possession charge such that "the details" of the underlying felony would be "withheld from the jury." At the end of the guilt phase trial, the court instructed the jury under CALJIC No. 12.44 that "the previous felony conviction has already been established . . . so that no further proof of that fact is required."

Defendant now contends that the trial court's ruling on the motion to bifurcate was error requiring reversal. According to defendant, the trial court misinterpreted *Valentine, supra,* 42 Cal.3d 170, as allowing *only two options* when a prior conviction is a substantive element of a current charge: Either the defendant admits to having a prior conviction and the court "sanitizes" the prior by keeping from the jury the nature of the offense, or the prosecution proves the prior conviction in open court. Defendant argues that *Valentine* allows *a third option*: full bifurcation of trial on the charge involving a prior conviction by having the trial court decide the charge outside the jury's presence. Defendant misconstrues *Valentine*.

This court's 1986 decision in *Valentine, supra,* 42 Cal.3d 170, interpreted article I, section 28, subdivision (f) of the California Constitution, added to the Constitution by Proposition 8, an initiative that the California electorate passed in 1982. It states: "When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court." (Cal. Const., art. I, § 28, subd. (f) (article I, section 28(f)).) *Valentine* concluded that the language was directed at *People v. Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826], which held that when an element of a charged offense requires proof that the defendant has a felony conviction, and the defendant offers to stipulate to the prior conviction, it is error to inform the jury either of the fact that the defendant has a prior felony conviction or the nature of the felony. (*Id.* at pp. 153–154.)

*Valentine* held that article I, section 28(f) eliminated "the per se rule of *Hall*" by requiring that the jury be advised that the defendant has suffered a prior felony conviction if such felony conviction is an element of a current charge. (*Valentine, supra,* 42 Cal.3d at p. 173.) ▮ But if the defendant offers to stipulate to a prior felony conviction, article I, section 28(f) allows evidence of the *nature* of that felony to be withheld from the jury. (*Valentine, supra,* at p. 173.) Thus, as the trial court properly ruled in this case, *Valentine* allows one of two alternatives when a defendant's prior felony conviction is an element of a charged crime: (1) The prosecution can prove the conviction in open court, and that proof can include both the fact that the defendant has previously been convicted of a felony offense as well as the nature of the felony involved; or (2) the defendant can stipulate to having a felony conviction and thereby keep from the jury the nature of the particular felony.

In insisting that *Valentine* allows a third option, that of full bifurcation of trial on the charge of being a felon in possession of a concealable firearm, defendant quotes this language from *Valentine*: "[T]he court must balance the legitimate benefits . . . of a consolidated trial against the likelihood that disclosure of ex-felon status in a joint trial will affect the jury's verdict on charges to which that status is irrelevant." (*Valentine, supra,* 42 Cal.3d at p. 180, fn. 3.) Contrary to defendant's assertion here, that language pertains not to a motion to *bifurcate* trial on a charge that requires proof of a prior felony conviction (the motion brought here), but to a motion to *sever* charges properly joined under section 954. The relevant portion of *Valentine*'s footnote 3 states in full: "[D]efendant argues that the trial court should at least have granted his motion to sever the firearm-possession count from the robbery charge in order to prevent disclosure of defendant's criminal record from affecting the jury's deliberations on the latter crime. We need not resolve that contention, since we hold that disclosure of the *nature* of defendant's priors was reversible error as to all counts. [¶] . . . [W]e decline to rule that such a procedure is mandatory in all cases. When the joinder statute (§ 954) would otherwise permit consolidation of charges, a trial court should,

if requested, carefully exercise its discretion whether to try [the firearm possession] count separately 'in the interests of justice.' " (*Valentine, supra,* 42 Cal.3d at p. 180, fn. 3.) This is followed by the sentence on which defendant relies, which states that a court considering such a *severance* request must balance the various interests. (*Ibid.*) Because this court in *Valentine* expressly declined to decide whether the trial court in that case abused its discretion in failing to grant the defendant's severance motion, its discussion of severance was dictum, as defendant acknowledges. (See *Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1278 [135 Cal.Rptr.2d 654, 70 P.3d 1067] [" 'an opinion is not authority for a proposition not therein considered' "]; *People v. Scheid* (1997) 16 Cal.4th 1, 17 [65 Cal.Rptr.2d 348, 939 P.2d 748] [same].)

Moreover, defendant concedes he did not move to *sever* the firearm-possession count from the three murder counts. He asserts, however, that although the *Valentine* dictum discussed only severance explicitly "its rationale . . . would apply to permitting full bifurcation (a mini-trial following the guilt trial on the main charges)." Not so. In footnote 3 in *Valentine* this court expressly rejected the idea that article I, "section 28(f) should be interpreted to require bifurcated trials, with proof of [prior felony convictions] made only to the judge, who would be the 'trier of fact' for this limited purpose." (*Valentine, supra,* 42 Cal.3d at p. 179, fn. 3.)

To summarize: *Valentine, supra,* 42 Cal.3d 170, allows the trial court only two options when a prior conviction is a substantive element of a current charge: Either the prosecution proves each element of the offense to the jury, or the defendant stipulates to the conviction and the court "sanitizes" the prior by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed. These are the same two options the trial court here offered defendant. Accordingly, there was no error.

Defendant accuses his trial counsel of rendering ineffective assistance, because, faced with those two options, counsel chose to have the court sanitize the prior felony conviction. Defendant contends that counsel's decision not to reveal to the jury the nature of defendant's prior felony conviction did him more harm than good for this reason: The prior pertained to the relatively minor offense of recklessly burning an inhabited dwelling. Because the jury had already heard evidence that defendant had set fire to Duarte's house, defendant argues that the jury might have speculated that his prior felony conviction was for an offense other than setting fire to Duarte's house, possibly something far more serious, such as murder. Preliminarily, we note that nothing in the record supports this conjecture by defendant.

"To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that this deficient performance caused prejudice in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 104 S.Ct. 2052]; see also *People v. Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland v. Washington, supra,* 466 U.S. at p. 697.)" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1122–1123 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

 In determining whether an attorney's conduct so affected the reliability of the trial as to undermine confidence that it "produced a just result" (*Strickland v. Washington, supra,* 466 U.S. at p. 686), we consider whether "but for" counsel's purportedly deficient performance "there is a reasonable probability the result of the proceeding would have been different." (*People v. Cash* (2002) 28 Cal.4th 703, 734 [122 Cal.Rptr.2d 545, 50 P.3d 332]; see *Strickland v. Washington, supra,* at p. 694.) That standard cannot be met here. Given defendant's confessions to the three murders in this case, and the physical and circumstantial evidence indicating that he was the killer in each instance, no reasonable probability exists that the jury would have acquitted him had it learned that his prior felony conviction was for reckless burning of an occupied dwelling rather than some other and perhaps more serious crime.

### D. *Admissibility of Defendant's Confessions*

Before trial, defendant moved to suppress evidence of statements he had made to law enforcement officers shortly after his April 25, 1986, arrest. After hearing testimony, the trial court granted the motion with respect to statements defendant made during interrogation on April 25, but denied it with respect to all the statements defendant made after he initiated contact with law enforcement officers on the evening of April 26. Thus, at the guilt phase of defendant's capital trial, the jury heard evidence of defendant's confessions to the murders of Weber, Duarte, and Abono, including evidence that he led detectives to the locations of those killings.

Defendant contends that the introduction of this evidence violated the self-incrimination and due process clauses of the federal and state Constitutions. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) Specifically, he claims the police violated his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), on April 25,

1986, and that as a result his confessions on April 26, 27, and 28 must be deemed involuntary. He also asserts that his confessions were involuntary because they were coerced. We disagree.

### 1. *Factual background*

Evidence at the suppression hearing established that on the morning of April 25, 1986, Nevada County Sheriff's deputies arrested defendant on a warrant issued by Butte County. On the way to the Nevada County jail, defendant volunteered that he "wanted to talk and clear things up," and that he could tell the deputies "about 20 murders."

About an hour after defendant's arrival at the jail, Sergeant Steven McCulloch of the Colusa County Sheriff's Department asked to talk with him about the Weber killing. Also present was Detective Bill Elliott of the Butte County Sheriff's Department, who was investigating the disappearance of defendant's mother. Sergeant McCulloch advised defendant of his *Miranda* rights (to remain silent and to have an attorney); defendant said he understood those rights but added that if the detectives wanted to talk about murders "maybe I should have an attorney." McCulloch continued to question defendant, and then Detective Elliott said he wanted to talk about the disappearance of defendant's mother. When defendant refused, Elliott appealed to him to reveal where he had hidden his mother's body so she could have a proper burial. Defendant became emotional, was "on the verge of tears," and did not respond, whereupon Elliott left the room.

Shortly thereafter, Detective Michael Tye of the Richmond Police Department arrived to question defendant about Duarte. Before entering the interview room, he spoke with Detective Elliott, who mentioned that defendant had said something about "possibly needing an attorney." When Tye joined the questioning, he ascertained that McCulloch had given defendant *Miranda* advisements. Tye then spoke with defendant for about two hours. He mentioned defendant's brother Mike, a fellow Richmond police officer, stressing that defendant's involvement in murders was "having some adverse effects on Mike," and that defendant could help his brother by telling the truth about what had happened to the victims.

After a two-hour dinner break, Detective Tye talked to defendant for about another half-hour, at which point defendant said he "wanted to have an attorney." Tye gave defendant his card and told him to "think about it overnight," adding that before the homicide investigators could again talk to defendant with or without an attorney being present, defendant would have to "get in contact" with them.

The next evening, April 26, Nevada County Sheriff's Deputy Mary Fryback was on duty in the jail when defendant called her to his cell and said he was

ready to talk to the investigators about "those murders that those guys were asking me about yesterday." Fryback told defendant that the investigators had all returned to their home counties and thus were not available to interview him. Defendant insisted that the investigators must have "left a message where to get them," and that Fryback should "go call them . . . now." Fryback alerted her superior, Deputy Sheriff Troy Arbaugh, who telephoned Sergeant McCulloch, Detectives Elliott, and Tye, relaying to them defendant's message. (Deputy Arbaugh would later testify that the investigators had asked him to make sure that defendant "in fact did want to speak with them about their cases" before they drove all the way back to Nevada County.) Thereafter, without advising defendant of his *Miranda* rights, Arbaugh inquired whether defendant was serious about talking to the investigators about the murders. Defendant replied: "I want to admit to three murders, two in Contra Costa County and one in Colusa County. I want to show where two of the bodies were buried and I will show where my mother is buried. I didn't kill her, but she was killed because of me, [and] I dumped the guy in the bay that did kill her." Defendant added that he wanted "to get it all behind" him and did not want "any attorneys" involved.

A short while later, defendant spoke for about 10 minutes by telephone with Detective Tye of the Richmond Police Department. That conversation was tape-recorded. With no questioning by Tye, defendant stated: "I just want to get this shit over with. I'll give you the locations of what you guys want." When Tye responded, "Okay," defendant said: "[T]he main reason is you've convinced me that it would be best for Mike [his police officer brother]. That's the main reason I'm doing this." Defendant added: "I'll tell you right now I killed Abono; I killed Weber; I killed Duarte; but I didn't kill my mother, but because of me, she died; and the person that killed her, I killed, and I'll tell you where he's at." Defendant then promised that Detective Tye would not "drive up here and drive back–frustrated again," to which Tye responded: "I'll be there first thing in the morning."

The next morning, April 27, Detective Tye arrived at the Nevada County jail before 9:00 a.m. to question defendant. He was soon joined by Sergeant McCulloch, Detective Elliott, and Tony Koester, an investigator for the Butte County District Attorney's Office. Tye readvised defendant of, and defendant waived, his *Miranda* rights. Tye commented that the *Miranda* waiver would "carry throughout the day," and he suggested it would be "a long day" of questioning. And Tye assured defendant that if at any time during that questioning, defendant did not want "to talk anymore," to just say so, and questioning would stop. Tye noted that he was "involved in the Duarte case," adding that "one of [his] main reasons" for wanting to talk to defendant was to convey how defendant's brother Mike, a Richmond police officer, was doing. Tye told defendant: "I thought that you should take that into consideration when you decided whether or not you wanted to talk with us."

Defendant replied that he still wanted to talk to the investigators. Defendant then made this statement: "I killed John Abono . . . . I did it for personal reasons. I killed Elizabeth Duarte for money. I was paid to kill her. I killed Robert Weber for money. I was paid to kill him."

Later that same day, April 27, the investigators drove with defendant to Contra Costa County, and he directed them to the areas where he had killed and buried Abono and Duarte. The next day, April 28, the investigators took defendant to Colusa County, and he led them to the area where he had killed Weber and left the body. At each location and in later interviews, defendant was readvised of and waived his *Miranda* rights, and continued to provide details about the three killings.

### 2. *Pertinent legal standards*

#### a. *Miranda*

The privilege against self-incrimination provided by the Fifth Amendment of the federal Constitution and by article I, section 15 of the California Constitution "is protected in 'inherently coercive' circumstances by the requirement that a suspect not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, the presence of an attorney, and, if indigent, to appointed counsel." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519] (*Cunningham*); see *Dickerson v. United States* (2000) 530 U.S. 428, 439–440 [147 L.Ed.2d 405, 120 S.Ct. 2326]; *Miranda, supra,* 384 U.S. 436.) " ' "If a suspect indicates 'in any manner and at any stage of the process,' prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated." ' " (*People v. Storm* (2002) 28 Cal.4th 1007, 1021 [124 Cal.Rptr.2d 110, 52 P.3d 52].) Rather, " 'the interrogation must cease until an attorney is present.' " (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 [68 L.Ed.2d 378, 101 S.Ct. 1880].) Moreover if, in violation of this rule, interrogation continues of an in-custody suspect who has asked for but has not been provided with counsel, the suspect's responses are presumptively involuntary and therefore "are inadmissible as substantive evidence at trial." (*Cunningham, supra,* at p. 993; see *McNeil v. Wisconsin* (1991) 501 U.S. 171, 176–177 [15 L.Ed.2d 158, 111 S.Ct. 2204].) Such exclusion is not required, however, when the "suspect personally 'initiates further communication, exchanges, or conversations' with the authorities." (*Cunningham, supra,* at p. 992, quoting *Edwards v. Arizona, supra,* at pp. 484–485.) The rule that interrogation must cease because the suspect requested counsel does not apply if the request is equivocal; "[r]ather, the suspect must unambiguously request counsel." (*Davis v. United States* (1994) 512 U.S. 452, 459 [29 L.Ed.2d 362, 114 S.Ct. 2350].)

### b. *Voluntariness*

The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make "inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 67 [1 Cal.Rptr.3d 650, 72 P.3d 280]; see *People v. Jimenez* (1978) 21 Cal.3d 595, 611 [147 Cal.Rptr. 172, 580 P.2d 672].) "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*People v. Neal, supra,* at p. 79; *Withrow v. Williams* (1993) 507 U.S. 680, 688–690 [23 L.Ed.2d 407, 113 S.Ct. 1745].)

■ Under federal standards, the prosecution "must demonstrate the voluntariness of a confession by a preponderance of the evidence." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033 [60 Cal.Rptr.2d 225, 929 P.2d 544], citing *Colorado v. Connelly* (1986) 479 U.S. 157, 168 [93 L.Ed.2d 473, 107 S.Ct. 515].) California courts use this standard for crimes committed *after* the June 8, 1982, enactment of article I, section 28 of the California Constitution, which as pertinent here prohibits the exclusion in criminal cases of relevant evidence not required to be excluded under the federal Constitution. (*People v. Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042]; see *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].) But for crimes committed *before* article I, section 28's June 8, 1982, enactment, the prosecution "must prove voluntariness beyond a reasonable doubt." (*People v. Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857]; *People v. Jimenez, supra,* 21 Cal.3d at p. 608.) Here, the December 1975 murder of Abono, and the January 1981 murder of Duarte were both committed before the enactment of article I, section 28. Thus, for those two crimes the prosecution had to prove that defendant's statements made after he asserted his right to counsel were voluntary beyond a reasonable doubt. Only for the August 1985 killing of Weber did the lower preponderance of the evidence standard for voluntariness apply.

In ruling on defendant's suppression motion in this case, the trial court applied the stricter beyond a reasonable doubt standard in determining that defendant had voluntarily confessed to all three murders. We " 'independently determine' " voluntariness while accepting " 'the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' " (*People v. Storm, supra,* 28 Cal.4th at pp. 1022–1023.) Nonetheless, we agree with the trial court that the prosecution proved beyond a reasonable doubt that defendant voluntarily confessed to all three murders. We likewise conclude that the confessions were not the tainted by a violation of defendant's *Miranda* rights.

Defendant's initial effort to invoke his right to counsel on April 26, 1986, shortly after his arrival at the Nevada County jail was equivocal and therefore inadequate to invoke the rule that all questioning must cease. (*Davis v. United States, supra,* 512 U.S. at p. 459.) Later that evening, when defendant unequivocally told Detective Tye he wanted an attorney, Tye stopped his questioning and properly advised defendant that none of the homicide investigators could question him unless defendant initiated contact with them. (*Edwards v. Arizona, supra,* 451 U.S. at p. 482.) Some 24 hours later, defendant summoned a jail guard and asked for the homicide investigators to come back so he could admit to three murders. (*Cunningham, supra,* 25 Cal.4th at p. 992.) Thereafter, he gave investigators a detailed account of the murders and led them to the crime scenes. Defendant was over 30, obviously intelligent and well-acquainted with the criminal justice system. The totality of circumstances show his decision to summon the investigators was not the result of coercion. On these facts, voluntariness is established beyond a reasonable doubt. (Cf. *People v. Neal, supra,* 31 Cal.4th at pp. 80–81.)

### 3. *California law before June 8, 1982*

Citing *People v. Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793], and *People v. Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114], defendant contends that under California law as it existed before the June 8, 1982, enactment of article I, section 28 of the California Constitution (prohibiting the exclusion in criminal cases of relevant evidence not required to be excluded under the federal Constitution), an equivocal invocation of the right to counsel was sufficient to invoke the California Constitution's self-incrimination clause. Because the trial court suppressed defendant's statements to the detectives on April 25, 1986 based on his equivocal assertion "maybe I should have an attorney," defendant argues here that his later confessions to the three murders should also have been suppressed as "the tainted product of" the detectives' unlawful interrogation of him on April 25. (See *People v. Sims* (1993) 5 Cal.4th 405, 445 [20 Cal.Rptr.2d 537, 853 P.2d 992] [applying a "fruit of the poisonous tree" analysis to a "subsequent confession"]; but see *People v. Bradford, supra,* 14 Cal.4th at p. 1041, fn. 3 [rejecting that analysis].) We disagree.

In addressing this argument, we assume that the trial court was correct in suppressing defendant's April 25 statements to the detectives as necessary to protect his California constitutional right against self-incrimination with respect to the murders of Abono and Duarte, both of which predated the enactment of article I, section 28. And we also assume that California law would require the suppression of a later confession that was the tainted product of statements made after an earlier equivocal assertion of the right to counsel. We conclude, however, that defendant's confessions to the three

murders on April 26, 27, and 28 were not the tainted product of his April 25 interrogation because an intervening independent act by defendant broke any possible causal link between the April 25 interrogation and his later confessions. (See *People v. Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960] [explaining that " 'an intervening independent act by defendant' " will "purge[] any taint from the initial suppressed confession"]; *People v. Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)

As we have already discussed, during questioning by Detective Tye on the evening of April 25, defendant unequivocally said he wanted an attorney. Tye immediately stopped questioning and told defendant there could be no further questioning by any of the homicide investigators unless defendant initiated contact with them. The next evening, defendant did so. Defendant's confessions to the murders introduced against him at his capital trial were made after defendant's independent intervening act of summoning the homicide detectives.

### 4. *Other contentions*

Defendant further contends that his statements should have been suppressed on the independent ground that they were obtained in violation of sections 821 and 825. At the time of defendant's 1986 arrest, the former provided that when a defendant is arrested on a warrant "in another county," the arresting officer must advise the defendant "of his right to be taken before a magistrate in that county." (§ 821.) The latter provided for the defendant to be taken "before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays." (§ 825, as amended by Stats. 1961, ch. 2209, § 1, p. 4554.) Defendant observes that he was arrested in Nevada County on an outstanding felony warrant issued by Butte County for the charge of felon in possession of a concealable firearm, and that his arrest was on April 25, 1986, a Friday. On the evening of Saturday, April 26, defendant first confessed to killing Weber, Duarte, and Abono, and he was arraigned in Contra Costa County on murder charges involving those killings on Wednesday, April 30.

*In the trial court*, defendant complained of the *four-day delay* between his April 26 murder confessions and his arraignment on those murders. At the hearing on defendant's suppression motion, Detective Tye attributed that delay to efforts to coordinate the cases with the involved counties, which included Contra Costa (where defendant killed Duarte and Abono) and Colusa (where defendant killed Weber), as well as Butte County (where defendant's mother's body was found), and the decision whether to charge defendant with a fourth count of murder involving his mother.

*In this court*, defendant complains of the *five-day delay* between his April 25 arrest and his April 30 arraignment but concedes that he did not object to that delay in the trial court. Accordingly, the point is not preserved for appeal. In any event, it lacks merit. Even before the enactment of California Constitution article I, section 28, which, as pertinent here, limited the suppression of relevant evidence in criminal cases (see *In re Lance W., supra*, 37 Cal.3d 873), delay in arraignment would justify suppressing a confession only upon a defendant's showing that the confession was the *product* of an illegal detention. (*People v. Thompson* (1980) 27 Cal.3d 303, 329–330 [165 Cal.Rptr. 289, 611 P.2d 883].) Defendant made no such showing here, nor could he, because the murder confessions were not the product of any illegal delay in arraigning him on the Butte County felon-in-possession charge. Arraignment on that charge on Monday, April 28, would have satisfied section 825's "two-day" timeliness requirement. By that time, however, defendant had already given detailed confessions to the three murders, and he had led authorities to the locations of the Duarte and Abono killings. On these facts, defendant's confessions were not the product of the prosecution's failure to timely arraign him on the firearm-possession warrant on Monday, April 28.

With respect to defendant's related claim that his detention violated the search and seizure clauses of the federal and state Constitutions (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44 [114 L.Ed.2d 49, 111 S.Ct. 1661]), that issue was not raised in the trial court and thus is not properly before us (*People v. Earp* (1999) 20 Cal.4th 826, 882 [85 Cal.Rptr.2d 857, 978 P.2d 15]). In any event, it is meritless. As we have already explained, defendant's detention after his arrest on an outstanding warrant was not unlawful.

E. *Withholding Access to a Reporter's Unpublished Notes of an Interview with Defendant*

1. *Trial court proceedings*

Some two weeks after defendant's arrest in this case, news reporter Erin Hallissy interviewed him for about two hours in the Contra Costa County jail. On May 10, 1986, Hallissy's article entitled *I Killed Many for Pay, Says Sapp* appeared on the front page of the Contra Costa Times newspaper. In January 1987, defendant served Hallissy with a subpoena demanding her presence at the preliminary hearing then scheduled for February 9, 1987, and requiring her to bring her "notes, memoranda, tapes of interviews, and statements taken at the interview." On Hallissy's motion asserting the newsperson's shield law (Evid. Code, § 1070), the magistrate quashed the subpoena, ruling that Hallissy could provide no relevant, admissible evidence for purposes of the

preliminary hearing, and that defendant was not entitled to use that hearing "for the purpose of discovery."

At the preliminary hearing, the magistrate held defendant to answer on the charges in this case. Thereafter, defendant moved in the superior court to dismiss the information. (§ 995.) Among the grounds asserted was the magistrate's quashing of the Hallissy subpoena. According to defendant, the magistrate's order violated defendant's "substantial right[s]" by preventing him from calling a witness at the preliminary hearing who could assist in the preparation of his defense. Specifically, defendant asserted that because most of the evidence against him "comes from [his] own mouth," and he "says different things at different times," all of his statements to Hallissy regarding the charged crimes would be relevant to preparing his defense.

The superior court, noting that the source of the information sought to be protected was "the very person seeking disclosure," ruled that the newsperson's shield law *did not apply* to Hallissy's notes of her interview with defendant. On that basis, without setting aside the information, it remanded the matter to the magistrate to reconvene the preliminary hearing. At that hearing, Hallissy appeared as a witness. Defense counsel sought to question her about unpublished information obtained in her interview with defendant, but she refused to answer the questions. Accordingly, the magistrate held Hallissy in contempt of court and ordered her into custody. On Hallissy's petition to this court, we stayed execution of the contempt order and transferred the matter to the Court of Appeal, directing it to issue an alternative writ.

### 2. Court of Appeal proceedings

The Court of Appeal, in a published decision, *Hallissy v. Superior Court* (1988) 200 Cal.App.3d 1038 [248 Cal.Rptr. 635] (*Hallissy*), issued a peremptory writ of mandate, vacating the superior court's remand order and the magistrate's contempt order. (*Id.* at p. 1046.) The court concluded that the remand to the magistrate was unauthorized by section 995a, subdivision (b)(1), which allows a remand without setting aside an information only for the correction of " 'minor errors of omission, ambiguity, or technical defect[s].' " (*Hallissy, supra*, at pp. 1042–1043, italics in *Hallissy* omitted.) The Court of Appeal nonetheless, as "guidance [for] the trial court," addressed issues pertaining to the newsperson's shield law and the magistrate's order. (*Id.* at p. 1044.)

*Hallissy* described the newsperson's shield law as generally conferring immunity from contempt "when a nonparty witness refuses to disclose . . . covered information." (*Hallissy, supra*, 200 Cal.App.3d at p. 1045.) Notwithstanding that immunity, the court added, a criminal defendant may be entitled

to discover information otherwise subject to the shield law. (*Ibid.*) Quoting *Hammarley v. Superior Court* (1979) 89 Cal.App.3d 388 [153 Cal.Rptr. 608] (*Hammarley*), the *Hallissy* court noted that " 'the burden is on the party seeking to avoid the [newsperson's] privilege competently to demonstrate not only that the evidence sought is relevant and necessary to his case, but that it is not available from a source less intrusive upon the privilege.' " (*Hallissy, supra,* at pp. 1045–1046.) That burden requires a defendant to show " 'a reasonable possibility that the evidence sought might result in his exoneration.' " (*Id.* at p. 1046.)

The Court of Appeal in *Hallissy* concluded that defendant had not satisfied that burden. It stated: "Sapp comes close to meeting only one of the several concomitants of the presentation described in *Hammarley*. Arguably he approaches an adequate showing of relevancy: he wishes to attack his own credibility by using inconsistent statements that he made to the reporter during the interview. But he has made no attempt to demonstrate that this particular item of evidence, if it exists, is necessary to his case, the second prong of *Hammarley*. In fact he concedes there are other individuals to whom he confessed and through whom he could prove the falsity of his confessions. This concession destroys any possibility that he can meet the third and fourth *Hammarley* hurdles: that the information he seeks is not available from a source less intrusive upon the privilege and that there is a reasonable possibility such evidence might result in his exoneration. Not only has he not met that burden he has proved the opposite: there are numerous nonprivileged sources of apparently fungible inconsistent statements by Sapp." (*Hallissy, supra,* 200 Cal.App.3d at p. 1046.)

### 3. *Our decision disapproving Hallissy*

In May 1990, before trial began in this case, this court decided *Delaney v. Superior Court* (1990) 50 Cal.3d 785 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*), and addressed several issues pertaining to the newsperson's shield law. Notably, *Delaney* adopted a different and less onerous test for a criminal defendant's discovery of information covered by the shield law than the one set out in *Hammarley, supra,* 89 Cal.App.3d 388, and reiterated by the Court of Appeal in *Hallissy, supra,* 200 Cal.App.3d at page 1046, when discussing the motion in defendant's case. *Delaney* states: "First, the burden is on the criminal defendant to make the required showing. [Citation.] Second, the defendant's showing need not be detailed or specific, but it must rest on more than mere speculation. Third, the defendant need not show a reasonable possibility the information will lead *to his exoneration*. He need show only a reasonable possibility the information will materially assist his defense." (*Delaney, supra,* 50 Cal.3d at p. 809, second italics omitted.)

In addition, *Delaney* rejected "a universal and inflexible alternative-source requirement" in criminal cases, and specifically disapproved contrary suggestions in *Hammarley, supra,* 89 Cal.App.3d at page 399, and *Hallissy, supra,* 200 Cal.App.3d at page 1046, on that point. (*Delaney, supra,* 50 Cal.3d at p. 812; *id.* at p. 813 & fn. 29.)

Finally, in discussing the interests to be protected by the shield law, *Delaney* observed that some circumstances "may, as a practical matter, render moot the need to avoid disclosure," and gave as an example a situation in which "*the criminal defendant seeking disclosure is himself the source of the information,* [when] it cannot be seriously argued the source (the defendant) will feel that his confidence has been breached." (*Delaney, supra,* 50 Cal.3d at p. 810, italics added.) In a footnote, *Delaney* made a specific reference to this case, stating: "Such was the situation in *Hallissy v. Superior Court, supra,* 200 Cal.App.3d 1038. A reporter published a story based on an interview with a criminal defendant that led to additional charges being filed against him. He sought to question the reporter to show the published statements were inconsistent with other statements the defendant had made to the reporter. The trial court correctly noted that 'The source of the information is the very person who is seeking full disclosure.' (*Id.* at p. 1042.) The Court of Appeal, however, paid no heed to this circumstance in reversing the order of contempt against the reporter. As explained above, such circumstance is significant. We disapprove *Hallissy* to the extent it did not consider the fact that the party seeking disclosure was the source of the unpublished information." (*Delaney, supra,* at pp. 810–811, fn. 27.)

Thus, this court's decision in *Delaney, supra,* 50 Cal.3d 785, rejected the Court of Appeal's analysis in *Hallissy, supra,* 200 Cal.App.3d 1038, for three key reasons: First, *Hallissy* concluded that defendant had to but failed to show the reporter's unpublished notes would lead to his exoneration (*id.* at p. 1046), whereas *Delaney* held a defendant need only show "a reasonable possibility the information will materially assist his defense" (*Delaney,* at p. 809, italics omitted). Second, *Hallissy* determined that defendant failed to show "that the information he seeks is not available from a source less intrusive upon the privilege" (*Hallissy,* at p. 1046), but *Delaney* held there was no universal and inflexible alternative source requirement (*Delaney,* at p. 812). Third, *Hallissy* ignored the fact that defendant was the source of the information he sought, whereas *Delaney* held that this circumstance "may, as a practical matter, render moot the need to avoid disclosure." (*Delaney,* at p. 810.)

### 4. *Defendant's contentions*

Defendant asserts here that because of the Court of Appeal's decision in *Hallissy, supra,* 200 Cal.App.3d 1038, which *Delaney, supra,* 50 Cal.3d 785,

disapproved on three points, he was denied access to the unpublished statements he had made to Contra Costa Times reporter Erin Hallissy. He further asserts that those statements likely would have contradicted statements he made to the investigating officers, and thus the unpublished statements, if introduced at his capital trial, would have aided his defense that he was a chronic false confessor.

Defendant acknowledges that the law of the case doctrine generally requires that an interlocutory appellate decision "must be adhered to throughout" the future progress of the case it decided (*People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481]), and that this rule, if applied here, would mean that the *Hallissy* court's interpretation of the newsperson's shield law would be binding on defendant's automatic appeal. He points out, however, that under an exception to the law of the case doctrine, an interlocutory decision in a case is not binding during later proceedings in that case if before those proceedings a decision in another case has "altered or clarified" controlling rules of law. (*People v. Stanley, supra,* at p. 787.) This, he asserts, is the situation here. Before defendant's capital trial, *Delaney, supra,* 50 Cal.3d 785, "altered or clarified" controlling rules of law with respect to the newsperson's shield law.

Even assuming that defendant is correct in his assertion that the situation here falls within an exception to the law of the case doctrine, his claim must fail, as we explain below.

We filed our decision in *Delaney, supra,* 50 Cal.3d 785, in May 1990. Defendant's capital trial did not begin until January 1991. Yet in the intervening seven months after *Delaney* altered or clarified the rules governing a criminal defendant's access to unpublished reporter's notes, defendant never sought to subpoena or otherwise obtain the unpublished notes of his 1986 interview with Erin Hallissy. As defendant concedes, after July 6, 1988, when the Court of Appeal's writ of mandate issued vacating the magistrate's contempt order, "[n]o further reference to the Hallissy matter appears in the record." Accordingly, defendant cannot now complain that the trial court refused to apply the *Delaney* standard in his case.

Moreover, even if we assume that defendant was erroneously denied access to his own statements made to reporter Hallissy, and that those statements substantially contradicted his confessions to law enforcement officers regarding the murders of victims Weber, Duarte, and Abono, defendant would not be entitled to relief. Because of the other strong evidence linking defendant to the killings of Weber, Duarte, and Abono, we are persuaded that the jury's consideration of defendant's self-serving denials to a newspaper reporter would not have altered the outcome of any of the murder charges or of the

multiple-murder special-circumstance allegation. (See *People v. Cooper* (1991) 53 Cal.3d 771, 820 [281 Cal.Rptr. 90, 809 P.2d 865].) With respect to the financial gain special circumstances, which substantially relied on defendant's admissions to the investigating officers, defendant arguably could establish prejudice if the reporter's unpublished notes of defendant's statements to the reporter showed that he had *denied* killing Weber and Duarte for money. In that situation the jury, faced with such contradictory statements by defendant about the role financial gain played in motivating his killings of Weber and Duarte, might have rejected one or both of the financial-gain special-circumstance allegations. But the record here is devoid of any suggestion that the reporter's unpublished notes included any denial by defendant that he committed these two murders for financial gain. On these facts, defendant has not shown that depriving him of access to Hallissy's unpublished interview notes prejudiced his defense to the two financial-gain special-circumstance allegations. (*Ibid.*)

## IV. GUILT PHASE ISSUES

### A. *Introduction of Certain Statements by Defendant*

At trial, the prosecution introduced evidence of defendant's confessions to law enforcement that he had murdered Weber, Duarte, and Abono. The prosecution also played for the jury recordings of the interrogation sessions during which defendant confessed, and it provided the jury with transcripts of the recordings. Both the tapes and the transcripts were "redacted" versions of the interrogation sessions, as the trial court excluded evidence of some parts of those sessions. Defendant complains here of 11 statements that were *not* ordered omitted and consequently were included in the materials given to the jury. He seeks reversal on the ground that the introduction of those 11 statements violated the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, asserting the statements indicated to the jury that defendant had committed other uncharged murders. We reject the contentions.

Of the 11 statements challenged here, defendant concedes that he objected only to four, and that his objections referred *not* to the federal Constitution but only to Evidence Code section 352, a state law authorizing a trial court to exclude evidence when "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Thus, with respect to all 11 statements defendant may not now claim denial of federal constitutional rights, and with regard to the seven not objected to on any ground he has not preserved any claim at all. (*People v. Earp, supra,* 20 Cal.4th at p. 882.) In any event, we are not persuaded that the trial court's admission of the 11 statements unduly prejudiced defendant.

In one of the four statements to which defendant objected on the ground of its being more prejudicial than probative (Evid. Code, § 352), defendant gave this response to a question why he had not killed Abono at defendant's house: "Because I don't like transporting bodies. I'd rather have them right . . . on the spot." This comment was probative of defendant's mental state when he killed Abono, because it supported the prosecution's theory that he had planned the killing and thus acted with the requisite premeditation and deliberation for first degree murder. It did not implicate defendant in killings other than those involved here, all three of which took place in the remote areas where defendant left or buried the bodies.

In the second instance, defendant gave this response to a question why he shot Abono with a .22-caliber pistol: "I'll kill people with a variety of weapons. I don't have any specific choice." This statement too was probative of defendant's guilt of killing the three victims here, each of whom was shot with a different caliber pistol (Abono: .22-caliber; Duarte: .38-caliber; Weber: nine-millimeter.). It negated any implication from the use of different caliber firearms that defendant was *not* the killer in each case. And because the charged crimes themselves involved "a variety of weapons," the statement did not suggest to the jury that defendant had committed murders in addition to those charged.

In the third instance, defendant gave this answer to a question about remorse for killing Abono: "Every time I've ever done any of these crimes, I wished I hadn't." Defendant's generic reference to "any of these crimes" did not suggest that he had committed murders other than those charged here.

In the fourth instance, when defendant was questioned about having nightmares after killing Abono, defendant answered: "I dream about everybody I've ever killed, and I see them walking on the streets sometimes . . . when I'm awake . . . . I've seen John [Abono] a few times. I've seen other people that I've murdered look me square in the face in a crowd of people . . . . I've seen people look at me, like Elizabeth Duarte and Robert Weber in the last week—look me square in the eye—it gets kinda scary, and I usually just keep on going, but I have seen—I've seen people I've murdered. I've seen people that look like them . . . . [T]hey're smiling at me . . . . All of them. Always." This statement too, although referring to "other people I've murdered," mentions by name just the three victims here: Abono, Duarte, and Weber. In context, the jury would not have understood the statement as an admission of defendant's guilt to uncharged murders.

With respect to the seven statements not objected to, we are satisfied that the outcome in this case would not have been different had those statements not been introduced at trial as part of defendant's confessions to the charged

crimes. We likewise reject defendant's assertion of ineffective assistance of trial counsel in failing to object to the statements. Their admission could not have affected the reliability of the trial process. (*Strickland v. Washington, supra*, 466 U.S. at pp. 686, 690; *People v. Earp, supra*, 20 Cal.4th at pp. 870, 874.) Some of the statements showed defendant to be remorseful or supported his claim to be a chronic false confessor. At least as to these, because the evidence would assist the defense, counsel's choice to forgo any objection may have been tactical.

## B. *Providing the Jury with Redacted Transcripts of the Interrogations*

Defendant also claims error in the admission of the redacted transcripts that were provided to the jury when the prosecutor played the recordings of the interrogation sessions during which defendant confessed to the three killings. Defendant asserts that "gaping blanks in the text" would have alerted jurors to his commission of uncharged crimes. Defendant contends the prosecutor exacerbated the problem when, in response to the trial court's question how he wanted to proceed, stated: "It's not up to me, Judge, we have already been through this and we [were] prepared to proceed. What goes on now is up to the Court and counsel." Defendant contends the jurors would have understood this comment to mean that "there was something on the tape the defense did not wish the jury to hear." Defendant cites the United States Supreme Court's decision in *Gray v. Maryland* (1998) 523 U.S. 185 [140 L.Ed.2d 294, 118 S.Ct. 1151] (*Gray*) to draw an analogy between the redacted transcripts of the recordings of defendant's interrogation sessions and *Gray*'s treatment of redactions in applying the *Bruton* rule (*Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]). The *Bruton* rule allows admission in a joint trial of one defendant's confession naming and incriminating another only if all direct and indirect identifications of the nondeclarant defendant are effectively deleted. (*Ibid.*; see also *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1230 [255 Cal.Rptr. 569, 767 P.2d 1047].)

We note at the outset that defendant objected to providing the jury with a transcript of the recordings. But after the trial court overruled that objection, defendant did not object to the blank spaces in the transcript text. Thus, he has not preserved this issue for review. (*People v. Earp, supra*, 20 Cal.4th at p. 882.) Moreover, the analogy to *Gray, supra*, 523 U.S. 185, is not well taken.

In *Gray*, the high court rejected, as an insufficient deletion of a jointly tried codefendant's identity, the use of a blank space or the word "deleted" in the confessing defendant's statement that "Me, [blank], and a few other guys [attacked the victim]." (*Gray, supra*, 523 U.S. at p. 192.) The deletion, in

context, was plainly a name of a person involved with the confessing defendant in the charged crime; jurors in all likelihood would have filled in the blank space with the name of the nonconfessing codefendant present in court. (*Ibid.*) Here, the blank portions of the transcript were far more lengthy, extending for several sentences or half a page. The content of the deleted material was not readily discernible.

Assuming that the prosecutor's brief comment would have suggested to the jury that defendant was responsible for the deletions, defendant suffered no prejudice. It is not reasonably probable that the jury would have returned verdicts more favorable to defendant had the prosecutor not made the comment.

C. *Cross-examination of Deputy District Attorney Lawrence Barnes*

To show that defendant had a history of confessing to murders he had not committed, the defense called Contra Costa County Deputy District Attorney Lawrence Barnes. He testified that in 1986 and 1987, he had prosecuted one Larry Leroy Brownson for the October 1984 murder of Roger Gardner. Defendant (who in 1986 and 1987 was in custody awaiting trial in this case) came forward at the time of Brownson's bail hearing and confessed to killing Gardner. At Brownson's trial, defendant testified for the defense consistent with that confession. Barnes had not believed defendant's confession and, testifying in this case as an expert witness, gave his reasons: Defendant's description of the Gardner killing differed in key respects from the physical evidence, and defendant had much to gain from "taking the rap" for Brownson who, as a Hell's Angel and high-level member of the Aryan Brotherhood prison gang, could make life easier for defendant in the California prison system.

When the prosecutor cross-examined Barnes, he asked, among other things, about Barnes's cross-examination of defendant in the Brownson case. With no objection by defense counsel, this exchange took place:

Prosecutor: "And then you asked [defendant] if since October of 1984 [the time of the Gardner killing] had he committed any other crimes?"

Barnes: "Did I ask that question?"

Prosecutor: "And he said numerous[?]"

Barnes: "Correct."

Prosecutor: "And you asked him if he had committed any other homicides[?]"

Barnes: "I did."

Prosecutor: "His response?"

Barnes: "He responded that he had."

Defendant now contends that "[t]here was no justification . . . for allowing the jury to hear that [defendant] claimed to have committed numerous crimes after October 1984, including one or more homicides." He asserts that in eliciting that information, which defendant characterizes as "propensity evidence," the prosecutor committed misconduct rendering defendant's capital trial fundamentally unfair and the death verdict unreliable. He further accuses his trial counsel of incompetence for not objecting to the prosecutor's questions. We reject these contentions.

A claim of prosecutorial misconduct is generally reviewable on appeal only if the defense makes a timely objection at trial and asks the trial court to admonish the jury to disregard the prosecutor's question. (*People v. Earp, supra*, 20 Cal.4th at p. 858; *People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) " '[O]therwise, the point is reviewable only if an admonition would not have cured the harm.' " (*People v. Earp, supra*, at p. 858.) Here, any harm could have been cured by an admonition; thus the claim in question is not preserved for appeal.

In any event, defendant suffered no possible prejudice from this testimony. The jury already knew from the prosecution's case that defendant had confessed to one homicide committed after October 1984, namely the August 1985 killing of Weber, and that he had committed "other crimes" after 1984, namely the Weber killing and possession by a felon of a concealable firearm. Moreover, the defense in this case was that defendant habitually confessed to crimes he had not committed. The evidence the prosecutor elicited was not inconsistent with that defense. For this reason, we also reject defendant's contention that his trial counsel was ineffective for not objecting to the prosecutor's line of questioning.

## D. *Duarte's Declaration in Support of Restraining Order*

In connection with testimony that murder victim Duarte had obtained a restraining order against defendant, the prosecutor moved into evidence the restraining order and supporting court documents. Included was Duarte's declaration of July 17, 1980 (some six months before her murder) detailing facts to justify the restraining order. These included assertions that defendant had "pounded [Duarte's] head against the wall and threw [her] to the ground," "destroyed [Duarte's] phones to prevent [her] from calling the

police," and repeatedly threatened to kill Duarte "if [she] did not let him continue to reside in [her] home." Duarte's declaration further stated that she had changed the locks on her doors but defendant "managed to break in through windows," that defendant carried "a gun on his person at all times," that she believed he had "a history of mental illness," and that she feared for her own life and that of her then four-year-old son.

Citing *People v. Noguera* (1992) 4 Cal.4th 599, 621 [15 Cal.Rptr.2d 400, 842 P.2d 1160], defendant asserts that Duarte's statements were inadmissible hearsay and not relevant to any issue in the case (see *People v. Hernandez* (2003) 30 Cal.4th 835, 872–873 [134 Cal.Rptr.2d 602, 69 P.3d 446]), and that consequently trial counsel rendered ineffective assistance in not objecting to Duarte's declaration. The Attorney General observes that "the decision whether to object is inherently tactical," and thus "will seldom establish incompetence." (*People. v. Freeman* (1994) 8 Cal.4th 450, 490–491 [34 Cal.Rptr.2d 558, 882 P.2d 249].) He asserts that counsel had a tactical reason for failing to object to the declaration: It supported the defense efforts to portray defendant "not [as] a cold-blooded killer, [but as] a mentally ill person who murdered [Duarte] out of a fit of rage, after being rejected by her."

Whether or not counsel had a sound tactical reason for objecting to admission of Duarte's declaration, defendant's claim of ineffective assistance of counsel must fail. Given the overwhelming evidence that defendant killed his former girlfriend Duarte, he suffered no possible prejudice from the admission into evidence of Duarte's declaration asserting that he was violent and had threatened to kill her. (See *Strickland v. Washington, supra*, 466 U.S. at p. 697.)

E. *Threat to Laura Norris*

After Duarte broke up with defendant, she started dating James Luddon. In January 1981, defendant paid Luddon $800 to lure Duarte to Luddon's house so defendant could kill her. At that time, Laura Norris and her husband, Tony Goularte, were living with Luddon. Norris testified for the prosecution that defendant saw Luddon in January 1981, both before and after Duarte's disappearance; that defendant made incriminating comments; and that on January 25, 1981 (the day after defendant's violent assault on Duarte at Luddon's house), Norris cleaned up blood splatters from the bathroom and hallway.

On cross-examination by the defense Norris said she did not tell the police "about this matter" until they contacted her in 1985. On redirect examination by the prosecution, Norris explained that she had not come forward earlier

"because I was afraid for my own life." Recross-examination by defense counsel established that defendant had never threatened Norris. The prosecution then sought to question Norris about a threat Luddon and Goularte made to her when she asked them what would happen if she gave the police information linking defendant to Duarte's disappearance. Defense counsel objected that Norris's answer would be hearsay and more prejudicial than probative. The trial court overruled the objection. Norris responded that Luddon and Goularte had told her that if she went to the police she "would end up just like Liz [Duarte]."

Defendant now contends that Norris's testimony about the threat rendered the trial fundamentally unfair in violation of his due process rights under the federal Constitution. This claim was not raised in the trial court and thus is not properly before us. (*People v. Earp, supra,* 20 Cal.4th at p. 882.) Moreover, the claim lacks merit. Norris's testimony that Luddon and Goularte had told her that if she went to the police she would end up "just like Liz" was properly admitted for the nonhearsay purpose of showing why Norris had not come forward sooner. (Evid. Code, § 780; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 [37 Cal.Rptr.2d 596].) "It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible." (*People v. Olguin, supra,* at p. 1368.)

In any event, under any standard, defendant suffered no possible prejudice, for the evidence that he killed Duarte was overwhelming.

F. *No Instruction on CALJIC No. 2.50*

Defendant contends the trial court should have on its own initiative instructed the jury under CALJIC No. 2.50, which provides: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. Such evidence, if believed . . . may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes." In the alternative, defendant argues that defense counsel was ineffective in not requesting the instruction. As we did in *People v. Hawkins* (1995) 10 Cal.4th 920, 942 [42 Cal.Rptr.2d 636, 897 P.2d 574], we reject both contentions. In that case, the other crimes evidence was cross-admissible. (*Ibid.*) Here, we have concluded that evidence of the two other murders was cross-admissible, at least to rebut the defense. (Pt. III.B., *ante.*) No instruction on propensity evidence was therefore warranted.

G. *Weber's Statement That He Had $17,000*

Defendant also faults counsel for failing to object to certain testimony by Weber's girlfriend, Linda Brown, as hearsay. Brown testified that before

Weber left to meet defendant for a "big drug deal," he told her he was taking $17,000 with him. We note that the prosecution, through the testimony of Brown and Weber's brother Michael, presented evidence independent of Weber's statements that when Weber left to meet defendant for the drug deal he took with him a substantial sum of money. Defendant contends he was nonetheless prejudiced by the hearsay testimony because it allowed the prosecutor to argue in support of the financial gain special circumstance involving Weber that the $27,000 in cash that defendant had when he was arrested in April 1986, exactly equaled Weber's missing $17,000 plus the $10,000 defendant said he was paid to kill Weber. We reject the claim because we cannot tell on this record whether the failure to object lacked a valid tactical basis. (See *People v. Freeman, supra,* 8 Cal.4th at pp. 490–491.)

## V. SPECIAL CIRCUMSTANCES

### A. *Evidence That Duarte Killing Was Carried Out for Financial Gain*

With respect to the Duarte killing, the jury found true the special circumstance that the murder was "carried out for financial gain." (§ 190.2, subd. (a)(1).) Defendant contends that finding was not supported by substantial evidence. We disagree.

"To determine the sufficiency of the evidence to support a special circumstance finding, we apply the same test used to determine the sufficiency of the evidence to support a conviction of a criminal offense. We 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Mayfield, supra,* 14 Cal.4th at pp. 790–791.)

In *People v. Noguera, supra,* 4 Cal.4th 599, we explained that financial gain need not have been a " 'dominant,' 'substantial,' or 'significant' motive for the murder." (*Id.* at p. 635.) " '[T]he relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.' " (*Id.* at p. 636.) Proof that the defendant derived pecuniary benefit from the murder is unnecessary. (*Ibid.*) "Defendant either had an expectation of financial benefit at the time of the killing or he did not. It was for the jury to make that determination, applying a common sense, nontechnical understanding of 'financial gain.' " (*Ibid.*)

Here, the evidence that defendant killed Duarte for financial gain was included in his confession to police in April 1986, after his arrest on a

warrant for being a felon in possession of a concealable firearm. Defendant told the police about an incident several months before the killing in which someone was shooting at him. He concluded Duarte had arranged the incident, so he "made [his] mind up then that [he] was going to kill her." Although his reasons for killing her were strictly "personal," someone, whom defendant refused to name, had offered him $20,000 to kill Duarte, and that, he said, "was like an added bonus." Defendant never received the money.

This evidence, viewed in the light most favorable to the judgment, if accepted by the jury, was sufficient to support its finding that the Duarte murder was carried out for financial gain.

According to defendant, our decision in *People v. Noguera, supra,* 4 Cal.4th 599, misconstrued the financial gain special circumstance as intended "to apply even where financial gain was not a motivating cause of the killing." Defendant criticizes this language in *Noguera*: "In *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], we rejected the claim that the unadorned language of the financial-gain special-circumstance instruction was flawed because it failed to convey to the jury any requirement that financial gain be the 'direct' or 'motivating cause' of the murder. Instead, we concluded that the drafters intended no such limitation." (Noguera at p. 635.) Defendant asserts this was a misreading of *Howard*, which, he states merely "focus[ed] on three instructions proffered by the defense and [found] them flawed." We agree with defendant that the financial gain special circumstance requires proof, as we said in *Howard*, that the "purpose" of the murder was to obtain financial gain, "whether or not achievable." (*People v. Howard, supra,* at p. 410, fn. 10.) This, however, is of no assistance to defendant because the evidence from his own confession was that financial gain was one purpose (albeit not the exclusive purpose) for his killing Duarte. Accordingly, we reject his related contention that the jury's "true" finding on the financial gain special circumstance was constitutionally deficient because no juror could have found *a* motivating factor to be defendant's financial gain.

## B. *Unanimity Instruction*

The jury returned a true finding on the special circumstance allegation that the Weber murder was carried out for financial gain. Defendant asserts that this finding must be set aside because the trial court failed to instruct on its own initiative that the jury must unanimously agree on a single act as supporting the financial gain special circumstance. (Cal. Const., art. I, §§ 7, subd. (a) & 16; *People v. Beardslee* (1991) 53 Cal.3d 68, 93 [279 Cal.Rptr. 276, 806 P.2d 1311] [" 'A unanimity instruction is required . . . if the jurors could . . . disagree which *act* a defendant committed and yet convict him of the crime charged' " (italics added)]; *People v. Mickle* (1991) 54 Cal.3d 140,

178 [284 Cal.Rptr. 511, 814 P.2d 290] & fn. 2, [applying unanimity require-
ment to special circumstance finding].) Defendant further contends that the
failure to so instruct violated the federal Constitution's Fifth and Fourteenth
Amendments by lightening the prosecution's burden of proving guilt of the
special circumstance beyond a reasonable doubt. (See *Schad v. Arizona*
(1991) 501 U.S. 624, 632 [115 L.Ed.2d 555, 111 S.Ct. 2491] (plur. opn. of
Souter, J.); *id.* at p. 652 (dis. opn. of White, J.).)

According to defendant, jurors could have relied on two different theories
in finding that he killed Weber for financial gain: his receipt of $10,000 for
killing Weber, or his theft from Weber of $17,000. We disagree.

Relevant here is *People v. Mickle, supra,* 54 Cal.3d 140, in which the jury,
although instructed that it must unanimously agree on a particular lewd act as
supporting the special circumstance finding (§ 190.2, subd. (a)(17)(v)), had
ambiguously described the act on the verdict form. We concluded that the
jury's description of the lewd act as involving " 'the victim[']s nudity and
[the] obvious use of force' " (*People v. Mickle, supra,* at p. 177, italics
omitted) meant it had "obviously agreed that a lewd and lascivious act had
occurred under one of two viable, closely connected theories, i.e., that
defendant either forcibly undressed [the victim] or forcibly compelled her to
undress herself." (*Id.* at p. 178.)

Here, the prosecutor in argument to the jury mentioned the $10,000
payment to defendant and defendant's theft of Weber's $17,000 to make the
point that defendant, when arrested some eight months after killing Weber,
had on him $27,439 in cash: "Think about it. He got $10,000 for killing
Weber. Mr. Weber had $17,000. Ask yourself. He didn't spend any money
during the interim[?] Probably not true. He did. He probably had some more
money. [Referring to defendant]. But the coincidence of the $27,000 is just
too much." "This time [defendant] gets enriched $17,000 in addition to the
ten grand that he was paid up-front to kill Weber." The prosecutor also
mentioned defendant's theft of Weber's $17,000 to make the points that
defendant was lying when he confessed to police and said that Weber had no
money, and that Weber's $17,000 would technically belong to the person or
persons who had hired defendant to kill Weber, giving defendant an added
incentive to falsely confess to the Brownson killing. Furthermore, the pros-
ecutor's sole reference to the financial-gain special circumstance connected it
to defendant being paid for the killing: "[T]he fact that he was paid makes
him a professional killer. [¶] Murder for financial gain."

The prosecutor never suggested the jury could find the financial gain
special circumstance to be true based on *either* the $10,000 payment for
killing Weber *or* defendant's theft of Weber's $17,000. Rather, the prosecu-
tor's argument wove the two incidents together. Accordingly, we are satisfied

that no juror would have believed that defendant took Weber's $17,000 but would have disbelieved that he was paid $10,000 for the Weber killing.

### C. *Applicability of Corpus Delicti Rule to the Financial Gain Special Circumstance*

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying exclusively upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 [119 Cal.Rptr.2d 903, 46 P.3d 372], italics omitted.) In *People v. Cantrell* (1973) 8 Cal.3d 672, 680–681 [105 Cal.Rptr. 792, 504 P.2d 1256], we held that the corpus delicti rule requiring proof independent of the defendant's statements did not apply to proof of a felony underlying a charge of felony murder. But in *People v. Mattson* (1984) 37 Cal.3d 85, 94 [207 Cal.Rptr. 278, 688 P.2d 887], we held that statutory language stating that a felony-murder special circumstance must be "proved pursuant to the general law" (former § 190.4, subd. (a)) made the corpus delicti rule requiring proof independent of the defendant's statements applicable to the felony offense underlying a felony-murder special-circumstance allegation.[2]

▮ With regard to special circumstance allegations not based on felony murder, such as the special circumstances of lying in wait (§ 190.2, subd. (a)(15)) and financial gain (§ 190.2, subd. (a)(1)), our 1988 decision in *People v. Howard, supra,* 44 Cal.3d 375, held that the *Mattson* rule does not apply because proof of the special circumstance "does not require proof of the commission of any crime in addition to the murder itself." (*People v. Howard, supra,* at p. 414.)

In this case the trial court, over defense objection, instructed the jury in accord with our 1988 decision in *People v. Howard, supra,* 44 Cal.3d 375, that "[t]he special circumstances of murder for financial gain may be established by the defendant's statement alone." Defendant contends this was federal constitutional error. Specifically, he asserts that applying the *Howard* rule to his case for the 1981 murder of Duarte and the 1985 murder of Weber violates the federal Constitution's ex post facto clause (U.S. Const., art. I, § 9, cl. 3) by lessening "the amount or measure of proof" necessary to prove the crime when it was committed. (*Hopt v. Utah* (1884) 110 U.S. 574, 589–590 [28 L.Ed. 262, 4 S.Ct. 202].) He also claims our decision in *Howard* made an

---

[2] Section 190.41, enacted as part of Proposition 115, overturned *People v. Mattson, supra,* 37 Cal.3d 85, for crimes committed after June 6, 1990. (See *People v. Ray* (1996) 13 Cal.4th 313, 341, fn. 13 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

unforeseeable change in the law with respect to proof of special circumstances other than those based on felony murder, and to apply that rule in the trial of special circumstance murders committed before *Howard* violates due process. (U.S. Const., 5th & 14th Amends.) But defendant fails to cite any case authority before *Howard* that applied the corpus delicti rule to a special circumstance allegation not based on felony murder. Thus, contrary to defendant, *Howard* did not unforeseeably change the law or lessen the prosecution's burden of proof on the financial gain special circumstances and he is not entitled to relief on those grounds.

### D. *Constitutionality of the Multiple Murder and Financial Gain Special Circumstances*

Defendant contends the multiple murder and financial gain special circumstances in California's 1978 death penalty law violate the federal Constitution's Eighth Amendment in that they fail to "genuinely narrow the class of persons eligible for the death penalty" (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 244 [98 L.Ed.2d 568, 108 S.Ct. 546]). We have previously rejected similar claims with respect to the special circumstances collectively, concluding that "California's scheme for death eligibility satisfies the constitutional requirement that it 'not apply to every defendant convicted of a murder[, but only] to a subclass of defendants convicted of murder.' " (*People v. Arias* (1996) 13 Cal.4th 92, 187 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Ray, supra*, 13 Cal.4th at p. 356.)

According to defendant, the multiple murder and financial gain special circumstances do not "foreclose[] . . . the prospect of . . . 'wanton or freakish' imposition of the death penalty." (*United States v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1445 (*Cheely*), quoting *Furman v. Georgia* (1972) 408 U.S. 238, 310 [33 L.Ed.2d 346, 92 S.Ct. 2726] (conc. opn. of Stewart, J.).) We disagree.

*Cheely* struck down on Eighth Amendment grounds federal mail bomb statutes that authorized the death penalty "for persons guilty of no more than involuntary manslaughter." (*Cheely, supra*, 36 F.3d at p. 1443.) *Cheely* does not assist defendant because under the multiple murder and financial gain special circumstances, no person guilty only of involuntary manslaughter is subject to the death penalty. To satisfy the requirements of each of California's special circumstances, a defendant must be "found guilty of murder in the first degree" and one or more special circumstances must be found "to be true." (§ 190.2, subd. (a).) For the multiple murder special circumstance, a defendant must, in the same proceeding, be convicted not only of first degree murder, but also of "more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).) The financial gain special circumstance

requires proof that the killing underlying the first degree murder conviction was "intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) Neither special circumstance exposes a defendant to the death penalty for involuntary manslaughter, and thus neither shares the defect found present in the mail bomb statutes by the majority in *Cheely*. Indeed, the *Cheely* majority would have found the mail bomb statutes constitutional had they provided "that the sentence of death could be imposed only where serious bodily harm or death were intended." (*Cheely*, *supra*, 36 F.3d at p. 1445, fn. 15.) "In such a case, the class of death-eligible defendants would be narrowed to those who had the mens rea of murderers, and whose chosen method of killing was both felonious and highly dangerous to third parties." (*Ibid.*)

 The special circumstances challenged here similarly narrow the class of death-eligible first degree murderers to those who have killed and killed again, and those who have killed to obtain personal monetary benefit. Exposing such defendants to the death penalty is not "wanton or freakish" and does not violate the Eighth Amendment.

## E. *Cumulative Effect of Errors*

Having rejected on the merits each of defendant's claims of error, we likewise reject his contention that he was prejudiced by the cumulative effect of errors committed before or at the trial on guilt and special circumstances.

## VI. PENALTY PHASE

### A. *Cross-examination of a Prosecution Rebuttal Witness*

#### 1. *Background*

At the penalty phase, defendant presented a substantial case in mitigation.

Dr. Arthur Kowell, a neurologist, testified that the Nicolet BEAM machine showed an abnormality in defendant's middle-left posterior temporal lobe. A BEAM test on defendant's son Richard detected a similar abnormality in the same area of Richard's brain. Magnetic resonance imaging or MRI scans showed that defendant also had a tumor at the base of his skull, near the brain center for impulse control. According to Dr. Robert Bittle, a psychiatrist, defendant's BEAM results indicated both brain damage and organic dysfunction. He stated that damage to an individual's left temporal lobe may cause sudden mood shifts and "aggressive, violent, destructive outbursts."

Dr. Donald Lunde, a Stanford University professor of clinical psychiatry, concluded that defendant was raised in a dysfunctional family in which his

mother, Geraldine Sapp, was the dominant figure. Geraldine had "various problems, including psychiatric" for which she was prescribed powerful antipsychotic drugs. She was inappropriately punitive, beating her children with a belt even for small infractions.

Psychologist Dr. Gretchen White expressed her opinion that defendant had grown up in an "atmosphere which . . . consistently and systematically undermined the civilizing influences of authority and societal figures." His mother had uncontrollable fits of anger. His oldest brother, Wayne, was in prison while defendant was growing up. And a first cousin was on death row.

Psychologist Dr. Stephen Pittell, the director of three Bay Area drug research and treatment centers, testified as an expert on the effects of substance abuse on the central nervous system. From interviews with defendant and his longtime friends, Dr. Pittell learned that defendant had since age 13 consumed an extraordinary quantity and variety of controlled substances including marijuana, LSD, heroin, sedatives, Valium, Seconal, methamphetamine, cocaine, and sleeping pills. Dr. Pittell considered defendant to be in the top 5 percent of Bay Area drug abusers. Defendant's friends confirmed that defendant would typically ingest one-half gram of methamphetamine six or seven times during an evening. This amounted to 3,000 milligrams or 15 times what is normally lethal. Methamphetamine apparently had a calming effect on defendant, who took it to counteract feelings of anger. Dr. Pittell concluded it worked on defendant in much the same way that Ritalin (a drug closely related to methamphetamine) tends to calm hyperactive children.

Psychologist Dr. David Stein, who administered psychological tests to defendant, concluded that defendant suffers from a poor self-image and creates "heroic and grandiose kinds of fantasies" to make himself feel better.

The prosecution, on rebuttal, sought to discredit the defense evidence. One rebuttal witnesses, Dr. Paul Berg, a psychologist, testified that he had reviewed various documents, including the tapes of defendant's confessions in this case, his juvenile court records, the probation report prepared in the felony case of reckless burning of a dwelling, and the psychological evaluations of defendant. Berg had also reviewed the transcripts of the defense penalty phase evidence. In his review of these materials, Dr. Berg saw nothing to suggest that family dysfunction or brain abnormalities would explain defendant's criminal behavior. Instead Berg concluded defendant manifested "an antisocial personality disorder," which was characterized by the lack of any restraints from societal prohibitions.

The defense sought to cross-examine Dr. Berg about charges of Medi-Cal fraud brought against him, some four years before the penalty phase trial, but

then dismissed. As defense counsel explained, Berg had been the subject of a complaint brought by the Attorney General alleging 43 counts of Medi-Cal fraud dating from 1982 to 1987. When Berg prevailed in his suppression motion, the Attorney General refiled the complaint but moved to dismiss it after determining that the remaining evidence was insufficient.

Defense counsel argued that the jury in this case had the right to know that Dr. Berg was dishonest. He pointed out that in a recent juvenile court matter a deputy public defender had been allowed to cross-examine Dr. Berg about the conduct underlying the charges. Counsel stated: "She asked him, as I would intend to do, if in fact he had committed Medi-Cal fraud . . . . [¶] [After additional questioning] Dr. Berg took the Fifth Amendment and his previous testimony on direct [examination was] stricken."

The trial court, relying on Evidence Code section 352, ruled the proposed cross-examination on a collateral matter to be more prejudicial than probative, noting that it would consume too much time and would "divert[] the jury" from its primary purpose of deciding the appropriate penalty in this case.

2. *Discussion*

Defendant now contends that the trial court abused its discretion in disallowing the proposed cross-examination, and that its ruling violated defendant's constitutional rights to confront and cross-examine a witness against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) We reject these contentions.

As we explained in *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938] (*Wheeler*): "The voters [in enacting Proposition 8] have decreed at the least that in proper cases . . . conduct involving moral turpitude should be admissible to impeach a criminal witness. [¶] [But Proposition 8's] section 28(d) does preserve the trial court's discretion to exclude evidence whose probative value is substantially outweighed by its potential for prejudice, confusion, or undue consumption of time. (Evid. Code, § 352.)" (*Id.* at p. 295.) "The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . . [¶] . . . Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id.* at pp. 296–297.)

Although *Wheeler, supra,* 4 Cal.4th 284, allows for impeaching a witness in a criminal case with evidence of moral turpitude, it cautions that trial

courts should consider with "particular care" whether to allow such evidence. (*Id.* at p. 296.) Here, the trial court acted within its discretion in precluding defense cross-examination of Dr. Berg about Medi-Cal claims that he submitted years before petitioner's trial and that were never proven to be fraudulent.

Defendant asserts that even if proper under state law, the trial court's ruling violated his federal constitutional right to confront a witness testifying against him. We disagree. ▮ The federal Constitution's confrontation right is not absolute; it leaves room for trial courts to impose reasonable limits on a defense counsel's cross-examination of a witness. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 106 S.Ct. 1431]; *People v. Box* (2000) 23 Cal.4th 1153, 1203 [99 Cal.Rptr.2d 69, 5 P.3d 130].) We discern no violation of defendant's right to confront and cross-examine Dr. Berg in the trial court's ruling here. Whether Dr. Berg had or had not filed false claims with Medi-Cal was, at most, nominally relevant to the subject matter of his testimony: expert opinion that defendant's criminal behavior was attributable to antisocial personality disorder, not brain abnormalities or family dysfunction.

*Lindh v. Murphy* (7th Cir. 1997) 124 F.3d 899, cited by defendant, fails to support his claim of federal constitutional error. In that case, a divided federal appeals court granted habeas corpus relief to a defendant who at the "mental state" phase of his Wisconsin murder trial was precluded from cross-examining a prosecution expert witness about potential sources of bias. The witness, a psychiatrist, testified that the defendant was not suffering from any mental disease when he killed his two victims. At the time of that testimony, the expert witness had felony charges pending against him that could have resulted in the loss of his medical license. As the federal appeals court explained: "[The psychiatrist] may have believed that testimony helping the prosecution in this case, which achieved notoriety throughout Wisconsin, would aid his cause, if only because it was bound to come to the attention of the judge who presided in the prosecution against him." (*Id.* at p. 901.)

Even then, the federal appeals court majority considered the confrontation clause question to be "close." (*Lindh v. Murphy, supra,* 124 F.3d at p. 901.) It granted relief to the defendant only because of prosecution evidence that the psychiatrist held particularly high stature in his profession, leaving the jury to view him and his testimony in a "rosy glow." (*Ibid.*) Here, defendant points to similar evidence of Dr. Berg's high standing as a psychologist. But the evidence also shows that Dr. Berg was not the subject of any criminal prosecution when he testified in this case, and thus unlike the expert witness in *Lindh* lacked any personal incentive to slant his testimony to "aid his cause." Here, the Attorney General had long since obtained a dismissal of the

charges against Dr. Berg for lack of evidentiary support; because the evidence necessary to those charges had earlier been suppressed, there was no likelihood of their being refiled.

There is another reason why *Lindh v. Murphy, supra,* 124 F.3d 899, does not assist defendant here. There, central to the court's decision to grant defendant Lindh relief was its conclusion that the state court "[p]roceedings to determine Lindh's mental state when he pulled the trigger were not strictly 'sentencing' " but rather were "closely associated with the issue of guilt or innocence." (*Id.* at p. 900.) A contrary conclusion would have been fatal to defendant Lindh's confrontation clause claim because that circuit follows the rule that the federal Constitution's confrontation clause *does not apply at sentencing,* including "the balancing phase" of capital sentencing. (*Szabo v. Walls* (7th Cir. 2002) 313 F.3d 392, 397–399 [distinguishing two aspects of the Illinois capital scheme, "the capital-eligibility phase" from the sentence-selection or "balancing" phase, and concluding that the right to confrontation does not apply to the latter].)

Even assuming that the Sixth Amendment to the federal Constitution protects the right to confront and cross-examine witnesses testifying at the penalty phase of a California capital trial and that this right was infringed by the restriction on defendant's cross-examination of prosecution rebuttal witness Dr. Berg, we conclude defendant suffered no possible prejudice.

On rebuttal, the prosecution sought to undercut defense evidence attributing defendant's criminal behavior to psychological and neurological factors outside his control. In addition to Dr. Berg, two other prosecution witnesses testified to that effect: Dr. Douglas Goodin, a neurology professor, testified that the BEAM test results relied on in the defense case in mitigation were not reliable. The technology was considered by its inventor to be experimental. According to Dr. Goodin, the BEAM technology is additionally questionable because of problems with the statistics used in evaluating BEAM test results, which score an extremely high percentage of persons in the abnormal range. Dr. Goodin reviewed defense witness Dr. Kowell's BEAM test results for defendant and defendant's son Richard, and pronounced defendant's results as within the range of normal. Asked about Kowell's determination that Richard's BEAM mapping was virtually identical to defendant's— implying some genetic explanation for defendant's criminal behavior—Dr. Goodin responded, "I think it's nonsense." Goodin testified that but for one insignificant point of overlap, the results for Richard and defendant were "completely different." Furthermore, murder victim John Abono's wife, Cathy Nelson, provided rebuttal testimony that defendant had long ago bragged about having a "mass" in his head, which he anticipated could prove useful to defend a criminal charge. Thus, to a substantial extent, Dr. Berg's testimony was cumulative of the testimony of the other prosecution rebuttal witnesses.

Defendant seeks to distinguish Dr. Berg's testimony from that of the two other prosecution rebuttal witnesses on the ground that only Dr. Berg discredited the entire defense case in mitigation, not just parts of it. Defendant argues that the testimony of Dr. Berg attributing defendant's murderous behavior to an antisocial personality rather than family dysfunction or brain abnormalities allowed the jury to reject the defense case in mitigation out of hand. As we explain, this argument fails.

The penalty phase jury asked during deliberations to rehear defense evidence regarding the effect of head injuries, brain abnormalities, and psychological influences on defendant's behavior. And that jury took three full days to return its verdict. Thus, the record fails to support defendant's contention that the jury disregarded the defense case in mitigation.

We also reject two related arguments made by defendant. He asserts that the prosecution improperly entertained inconsistent theories about Dr. Berg's behavior in this case and in the two cases the Attorney General brought against Dr. Berg for Medi-Cal fraud. In the fraud cases, the Attorney General was obviously taking the position that Berg had fraudulently obtained public funds, whereas here the prosecutor, in opposing defendant's motion to cross-examine Berg about Medi-Cal fraud, argued that Berg probably had done nothing wrong. Defendant likens this to a prosecutor who, to convict codefendants in separate trials, offers inconsistent theories and facts regarding the same crime. (See *Thompson v. Calderon* (9th Cir. 1997) 120 F.3d 1045, 1058 (in bank), revd. on other grounds *sub nom. Calderon v. Thompson* (1998) 523 U.S. 538 [140 L.Ed.2d 728, 118 S.Ct. 1489].) We are not persuaded.

Whatever similarity may exist between a prosecutor who argues inconsistent theories of individual culpability to obtain convictions of codefendants tried separately and a prosecutor who argues that the facts underlying a dismissed criminal case may ultimately prove more time-consuming than probative for impeaching a witness, it does not assist defendant here. As we have already concluded, defendant suffered no possible prejudice from the court's allowing the jury to hear Dr. Berg's testimony without learning that Berg had been the subject of dismissed charges of Medi-Cal fraud.

Defendant also asserts that trial counsel was ineffective in failing to point out that the prosecutor was advancing a position inconsistent with the Attorney General's case against Dr. Berg and for not arguing that the evidence suppressed in the Attorney General's case against Dr. Berg would

have been admissible in this case. These claims too fail for want of prejudice. (*Strickland v. Washington, supra,* 466 U.S. at p. 669, 104 S.Ct. 2052.)[3]

### B. *The Murder of Geraldine Sapp*

#### 1. *Sufficiency of evidence*

Included in the prosecution's penalty phase case in aggravation was evidence that defendant had committed the unadjudicated murder of his mother, Geraldine Sapp. (§ 190.3, factor (b) [allowing jury consideration of "criminal activity by the defendant that involved the use or attempted use of force or violence"].) Defendant unsuccessfully sought to have the evidence excluded as legally insufficient. He renews that contention here, asserting that the evidence failed to "support a finding by a rational trier of fact as to the existence of such activity beyond a reasonable doubt." (*People v. Clair* (1992) 2 Cal.4th 629, 672–673 [7 Cal.Rptr.2d 564, 828 P.2d 705].) He also argues that introduction of the evidence rendered the death verdict unreliable in violation of the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. We disagree.

In 1984 and 1985, defendant's mother Geraldine Sapp was living near Oroville in Butte County. In October 1984, she withdrew $5,000 from her savings account at the First Interstate Bank in Oroville. In February and March 1985, Geraldine, accompanied by defendant, went to the First Interstate Bank to cash certificates of deposit totaling $58,000, which the bank paid to her in $20, $50, and $100 bills. She told bank personnel she needed the money for a business venture with her son "John."

In June 1985, defendant was living with Geraldine. A neighbor, Carmella Borchard, kept livestock on Geraldine's property. Borchard saw Geraldine on June 4 or 5, but never saw her again. Borchard recalled that defendant left in his van during the afternoon of June 5 and returned two days later. She deduced that while defendant was away no one else was at Geraldine's place because the water trough for Geraldine's livestock was empty and one of Geraldine's horses was trying to eat the feed Borchard provided for her own horse.

On June 7, around 4:00 p.m., defendant inquired of another neighbor, Margarita Richards, whether she had seen Geraldine. Defendant told Richards

---

[3] The Attorney General asked that we take judicial notice of a finding by the Alameda County Municipal Court under section 851.8, subdivision (b) that Dr. Berg was "factually innocent" of the Medi-Cal fraud charges. (See *People v. Adair* (2003) 29 Cal.4th 895 [129 Cal.Rptr.2d 799, 62 P.3d 45] [discussing factual innocence findings].) The factual innocence finding dates from March 1, 1993, about one and one-half years after trial ended in this case. We have denied the Attorney General's request and do not rely on the factual innocence finding in resolving the claims here.

that he had just returned home and that his mother was not at the house, but that none of her things appeared to be missing. Defendant then notified the Butte County Sheriff's Department that his mother was missing. Deputy Sheriff Donald Houghton came to the house and spoke with defendant. Defendant said that he had been in the Bay Area fishing for two days and when he returned home, the house was locked but his mother was not there. Her clothes, checkbook, purse, and wallet were in the house and her car was in the garage. Defendant also told Deputy Houghton that when he got back from fishing he found a couple of days' mail in the mailbox and newspapers in front. Defendant had checked with friends and relatives but no one knew Geraldine's whereabouts. Defendant told Houghton that he suspected his mother had been kidnapped by Gene and Carlene Aughe, members of an "outlaw" motorcycle gang. The next day, June 8, defendant telephoned Tony Koester, an investigator for the Butte County District Attorney's Office and said the Aughes had kidnapped Geraldine because she had testified against them in 1983.

After defendant's April 26, 1986, arrest in Nevada County on an outstanding warrant, he again spoke with investigator Koester about his mother's disappearance. This time defendant said that when he returned to his mother's house on June 7, 1985, he knew within five seconds who was responsible for her disappearance. Defendant described the person only as a 42-year-old White male, who lived in Concord and dealt in large quantities of drugs. According to defendant, his mother had "nosed" into the drug dealer's business, so the man killed her. Defendant added that he had found the man, taken him at gunpoint by boat to an area in the San Francisco Bay between Alcatraz and Angel Islands, and extracted from him a confession and the location of Geraldine's body. Defendant then killed the man and dumped his body in the bay.

On April 27, 1986, defendant directed Butte County law enforcement officers to a remote area near the town of Gridley. Defendant walked to a dried-up pond, and said this was the location where the killer said he had left Geraldine's body. On May 1, 1986, no more than 30 feet from the area pointed out by defendant, a search team found Geraldine's skeletal remains. Her death was likely the result of a powerful blow to the skull, which drove the mandible into the cranium, severing the artery.

Contra Costa County 's missing persons records for the dates June 1, 1985, through June 1, 1986, showed the filing of 38 missing persons reports. All of those were ultimately accounted for; there was no open case in that period involving a missing White male in his early 40's (allegedly killed by defendant for killing defendant's mother, Geraldine).

From this evidence, the jury could reasonably conclude that defendant on either June 4 or 5, 1985, killed his mother and deposited her body in the remote area near Gridley. Over the next few days, he traveled to the Bay Area to establish an alibi, reported his mother missing and, to deflect attention from himself, suggested that an outlaw couple, the Aughes, had kidnapped her, and that he later falsely claimed that an unnamed White male in his early 40's was the killer.

### 2. *Comment by defense expert witness*

We reject defendant's contention that the penalty phase judgment must be reversed for prosecutorial misconduct in eliciting on cross-examination a comment from a defense expert witness, Dr. Donald Lunde, that defendant's siblings did not visit him in jail because they believed he had killed their mother. Defendant also asserts that defense counsel was ineffective in failing to object, particularly because the topic had been earlier ruled inadmissible when raised in connection with evidence that defendant's brother Mike thought defendant was their mother's killer.

Both claims fail for want of prejudice. It is neither reasonably possible (*People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254]) nor reasonably probable (*Strickland v. Washington, supra*, 466 U.S. at p. 669) that the jury would have reached a different verdict at the penalty phase had it not heard Dr. Lunde's brief comment.

### 3. *Prior statements of Jeanne Aplington*

Jeanne Aplington was defendant's girlfriend for about three years, including the summer of 1985 when his mother disappeared. On June 12, 1985, a few days after defendant reported his mother missing, Butte County District Attorney investigator Tony Koester interviewed Aplington and prepared a report. On November 18, 1985, the Butte County District Attorney's Office deposed Aplington.

The prosecution subpoenaed Aplington to testify at the penalty phase of defendant's capital trial. She appeared with counsel, but refused to talk to the prosecutor. The trial court held a hearing outside the jury's presence to decide whether the prosecutor could use prior statements by Aplington from her June 12, 1985, interview by investigator Koester and her November 18, 1985, deposition to impeach her before the jury. At that hearing, Aplington claimed she could not remember the statements she made to investigator Koester and in her deposition. The trial court ruled that Aplington had given "a series of evasive answers" and her "stated lapse of memories are in effect denials," and therefore, over defense objection, allowed the prosecutor to use Aplington's

prior statements to impeach her. The statements included (1) claims by Aplington that she spoke by telephone with Geraldine Sapp on June 4 and 5, 1985, and that defendant spent the night of June 5, 1985, at Aplington's home in Contra Costa County, and (2) recitations by Aplington of defendant's comments implicating himself in Geraldine's disappearance.

Defendant now contends that these prior statements by Aplington were inadmissible hearsay (Evid. Code, § 1200) whose admission denied him the right of confrontation under the Sixth Amendment to the federal Constitution. Because defendant concedes that defense counsel did not raise a Sixth Amendment objection in the trial court, that issue is not properly before us. In any event, we reject the contention.

"A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219 [14 Cal.Rptr.2d 702, 842 P.2d 1].) Those statutes, as relevant here, provide for the admission against a hearsay challenge of a prior statement by a witness "if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." (Evid. Code, § 1235.) Under Evidence Code section 770, prior inconsistent statements are admissible only if: "(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

Defendant does not deny that the conditions of Evidence Code section 770 were satisfied here. Rather, he asserts that Aplington's trial testimony was not inconsistent with her former statements because she testified that she *could not recall* either the specific events in 1985 regarding the disappearance of defendant's mother or what she had said about those events at that time. We spoke to this exact issue in *People v. Johnson, supra,* 3 Cal.4th at page 1219: "Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] However, courts do not apply this rule mechanically. 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citation.] *When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.* [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (Italics added.)

That is the situation here. Ample evidence supports the trial court's determination that Aplington's lack of memory amounted to deliberate evasion. Thus, there was no state law error. Furthermore, admission of Aplington's prior statements under one of this state's traditional hearsay rule exceptions did not implicate defendant's Sixth Amendment right to confront and cross-examine her because she testified and thus was subject to defendant's cross-examination. (*People v. Zapien* (1993) 4 Cal.4th 929, 955 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Because there was no confrontation clause violation, we reject on the merits defendant's claim that his trial counsel was ineffective in failing to object to the admission of Aplington's prior inconsistent statements on that ground.

### 4. *Defendant's "appointment in Sacramento"*

Defendant raises another claim arising from Aplington's trial testimony. The prosecutor sought to elicit evidence that defendant made incriminating statements before and after he took a polygraph test on June 11, 1985, in Sacramento for the Butte County District Attorney investigators. To do so, the prosecutor questioned Aplington using the transcript of her November 18, 1985, deposition and, in an effort to refresh her recollection, had her look at the transcript. Earlier, at the hearing without the jury present (see pt. VI.B.3., *ante*), the prosecutor had mentioned the polygraph when questioning Aplington about defendant's incriminating statements, but she denied any recollection of those statements.

At trial, when the prosecutor began his questioning of Aplington about defendant's statements before and after the polygraph test, he tried to avoid mentioning the polygraph test itself by asking Aplington if she recalled defendant having "an appointment in Sacramento that he was going to keep." Aplington replied that she did not understand "what you're asking," and then asked, "What appointment would that be?"

The prosecutor then requested a sidebar conference. The trial court suggested that to avoid the witness "blurt[ing] something out that's inappropriate . . . something to do with a . . . polygraph," the parties should stipulate to a "sanitized" phrase to substitute for the word "polygraph" in the deposition transcript. Defense Counsel Houghton responded: "I have no problems stipulating that the deposition [transcript] indicates that [defendant] had an appointment in Sacramento." But Defense Counsel Young disagreed, suggesting that the "sanitized stipulation," in which the phrase "appointment in Sacramento" would be substituted in the transcript for the word "polygraph" would have no "relevance . . . to the D.A.'s burden of proof." The trial court then stated: "I suppose [the prosecutor] could plunge into it. Under the circumstances, somebody mentions polygraph, I will tell [the jurors] they can't pay any attention to it."

Thereafter, to lay a foundation for introducing Aplington's prior statements describing defendant's incriminating comments, the prosecutor questioned her about defendant's having a meeting in Sacramento. During this questioning, the prosecutor referred the witness to the deposition transcript. This exchange took place:

Prosecutor: "Now, do you remember the appointment that [defendant] had in Sacramento?"

Aplington: "Well, I have read [the transcript]. I'm sure I said it. But at this point in time I don't remember those days."

Prosecutor: "Do you remember the appointment in Sacramento?"

Aplington: "I won't have any reason to lie, but to this date I do not remember it."

The questioning continued:

Prosecutor: "Well, last week, for example, when you testified [outside the jury's presence], you indicated that you didn't remember and then all of a sudden you later recalled."

Aplington: "That I talked to [defendant]?"

Prosecutor: "About that appointment in Sacramento. Didn't you?"

Aplington: "I think I felt pressured into it pretty much. Because I really don't recollect it."

Prosecutor: "Didn't last week you say in this Court, I don't recall, and then suddenly remembered the appointment in Sacramento?"

Responding to this question, Aplington blurted out: "The polygraph?"

Defense counsel objected, and the trial court instructed the jury: "Ladies and Gentlemen, there's been a mention of a polygraph. This is something that under no circumstances should enter into your considerations in this case. Whether there was or was not is not something that's permitted into your considerations. That's one of those things that you have to completely and totally strike from your memories and from any use in this trial.

"Certainly if somebody does think during your deliberations that is something you should speculate about, then the rest of you are going to have to say, no, that can't be done.

"Is that okay with everybody? Anybody have any questions about that?

"No speculation. No use of it under any circumstances whatsoever?'"

Thereafter, the prosecutor continued to question Aplington about defendant's incriminating statements and used as a point of reference the meeting in Sacramento. For example, the prosecutor asked: "Before [defendant] left the meeting in Sacramento, did he tell you that if you did not hear from him you're to call the [Butte County] Sheriff's Department and 'see what my bail is'?"

Defendant now contends the prosecutor "badgered" Aplington into revealing that defendant "had taken a polygraph examination regarding his mother's disappearance" and then "exploited the error in a way that allowed the jury to infer" that defendant had "failed the test." According to defendant, this rendered the penalty trial fundamentally unfair in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Defendant's theory seems to be that the prosecutor was to blame for Aplington's mention of the polygraph, and that his continued questioning of her thereafter about defendant's "meeting in Sacramento" would have suggested to the jury that defendant took a polygraph test and flunked it. Defendant also accuses his trial counsel of incompetence for not asking the trial court to order the prosecutor to replace the phrase "meeting in Sacramento" with some less specific reference, such as "sometime in the week after Mrs. Sapp's disappearance." We reject these contentions.

"Evidence Code section 351.1 provides that the results of a polygraph examination 'shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results.' The statute also excludes evidence of 'an offer to take' or the 'failure to take' such a test." (*People v. Espinoza* (1992) 3 Cal.4th 806, 816 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Thus, evidence that a defendant took a polygraph test would violate California statutory law. No such evidence was introduced in this case, however. Rather, the prosecutor and the trial judge, both mindful that Aplington might "blurt" out something about defendant's taking a polygraph examination, sought to "sanitize" the language in the transcript the prosecutor was using when questioning Aplington. Although Attorney Houghton offered to enter into a stipulation that would have eliminated the word "polygraph" from the transcript, Attorney Young disagreed on the ground that such a stipulation would lighten the prosecution's burden of proof. While defense counsel had no obligation to enter into the stipulation suggested by the trial court, under the circumstances here, when the witness, as the trial court predicted, blurted out the word "polygraph," defendant cannot fault the court or the prosecutor. (See *People v. Cooper, supra,* 53 Cal.3d at p. 827.)

In any event, Aplington's comment was brief and did not directly tell the jury whether or not defendant had taken a polygraph test or inform it of the subject matter or results of any such test. The trial court immediately admonished the jury not to consider anything about a polygraph examination. We assume the jury complied with that admonition. (*People v. Pride* (1992) 3 Cal.4th 195, 240 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Moreover, in light of the very strong, if not overwhelming, evidence that defendant killed his mother, the witness's blurting out the word "polygraph" resulted in no possible prejudice.

### 5. *Aplington's fear of defendant*

At trial, the prosecutor presented evidence that in 1985 and 1986, defendant made various threats to Aplington, and she was afraid of him. The trial court ruled such evidence relevant to Aplington's credibility, specifically on the issue of the validity of her claimed inability to recall pertinent incidents surrounding the disappearance of defendant's mother, Geraldine. Thus, the prosecutor elicited Aplington's testimony that defendant threatened to put Aplington and her two young daughters "in the pond" behind Geraldine's house. Aplington stressed, however, that defendant "didn't say kill, because putting us in the pond, underneath the pond is obviously not living, but he did not use the word kill." The prosecutor also brought out that at Aplington's deposition, when asked if she "believe[d]" defendant might kill her, she replied, "I *know* that after this," adding, "you guys get to go home to your normal houses and stuff and you won't have [defendant] coming after you." (Italics added.)

Shortly after June 8, 1985, when defendant reported his mother missing, Aplington moved with her children from her Contra Costa County home to a women's shelter in Monterey County. On July 15, 1985, Aplington telephoned District Attorney investigator Tony Koester and told him she was very frightened of defendant, who was "call[ing] around," trying to find out where she was hiding. But when cross-examined in this case, Aplington attributed her fearfulness not to anything defendant had done but to the "authorities" who threatened to take her children away and send her to jail if she failed to cooperate, and who were telling her she would be defendant's next victim.

Defendant now contends that the trial court erred by admitting evidence of Aplington's fear of him, and that the prosecutor's comments on this evidence during closing argument were misconduct. He further contends that the trial court should on its own initiative have instructed the jury it could consider this evidence only in assessing Aplington's credibility and not as showing defendant's intent to harm Aplington, and that trial counsel was ineffective

for not requesting such a limiting instruction. According to defendant, the treatment of the evidence of Aplington's fear violated not only California law but also the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, thus compelling reversal of the death judgment. We disagree.

Generally, evidence that a witness is afraid to testify is admissible as relevant to the witness's credibility. (Evid. Code, § 780; *People v. Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218].) Assuming that evidence of Aplington's fear of defendant in 1985 and 1986 shortly after defendant's mother disappeared would have somewhat less bearing on Aplington's apparent unwillingness to testify for the prosecution in 1991 at defendant's capital trial, we discern no possible prejudice. We have considered the evidence, the prosecutor's treatment of it during closing argument, and trial counsel's failure to request a limiting instruction that the court had no obligation to give without request (*People v. Padilla* (1995) 11 Cal.4th 891, 950 [47 Cal.Rptr.2d 426, 906 P.2d 388]). We are satisfied that it is neither reasonably possible (*People v. Jackson, supra,* 13 Cal.4th at p. 1232) nor reasonably probable (*Strickland v. Washington, supra,* 466 U.S. at p. 669) that the evidence or its treatment altered the penalty phase outcome at defendant's capital trial.

C. *The Attempted Murder of Donna Smith*

Over defense objection, the prosecution introduced this evidence at the penalty phase of defendant's trial: Donna Smith, a drug dealer and manufacturer, became friends with defendant in 1983. Early in their relationship, Smith and defendant were wrestling on a lawn when defendant said he wanted "to fuck [Smith] just before [her] body turned cold while it was still bleeding."

In early 1986, Smith was living with Carolyn Clark and Brian Magidson at Lake Tahoe. Magidson gave Smith $48,000 to keep for him while he served a prison term. Defendant knew about the money but did not know where Smith had hidden it. While Smith and defendant were away, federal Drug Enforcement Agency (DEA) agents raided Smith's house. When Smith and defendant returned, Magidson's money was missing. Defendant suggested the DEA agents had taken the money. Smith told Clark she thought defendant had taken the money. Magidson blamed Smith for the loss.

On March 21, 1986, defendant telephoned Smith telling her he had heard she had accused him of stealing Magidson's money. Defendant said he was going to have to "whack" somebody, and that she had better get the money situation straightened out so he did not have to "come up [to Lake Tahoe] and put holes in people." Defendant also said he "didn't want to have to come up

there and shut [Smith's] mouth permanently." Shortly thereafter, Smith was arrested. Defendant wrote to her in jail, accusing her of "trying to set [him] up," and stating that "people [they] knew" wanted Smith dead and had asked defendant to "whack" her.

In April 1986, Smith was living at her father's house trailer in Grass Valley, near Nevada City in Nevada County. Smith arranged with the Nevada County Sheriff's Department to set defendant up. Smith telephoned defendant and asked him to drive her to New Mexico. Initially, he "put[] [her] off" but ultimately he agreed. On April 22, defendant called Smith and said, "I am coming to your Dad's, [so] make sure there is nobody around." Defendant arrived at the house trailer around 11:00 a.m., and was promptly arrested on the outstanding Butte County warrant for being a felon in possession of a concealable firearm. In defendant's car, Sheriff's deputies found several firearms, including a .22-caliber Ruger pistol equipped with a homemade silencer. When questioned after his arrest, defendant told Butte County District Attorney investigator Koester that he had gone to Grass Valley intending to use the Ruger pistol to kill Smith. He also told Colusa County Deputy Sheriff Steven McCulloch that he planned to kill Smith and bury her body in the desert.

The trial court instructed the jury: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts or activity." The court then mentioned the criminal acts on which evidence was presented including "The attempted murder of Donna Smith." At defense counsel's request, the trial court did not instruct the jury on the elements of attempted murder. (See CALJIC Nos. 6.00, 6.01 (5th ed. 1988).)

Defendant contends the evidence was legally insufficient to establish attempted murder, and it failed to satisfy the requirements of the corpus delicti rule. He further contends that counsel was ineffective in expressly waiving a jury instruction on the elements of attempted murder. According to defendant, juror reliance in this case on the evidence described above rendered the death verdict unreliable in violation of the federal Constitution's Eighth and Fourteenth Amendments because the prosecutor in argument to the jury substantially relied on the incident involving Smith, stressing to the jury that were it not for "good police work," "Donna Smith would be dead today" and "we would have another body." We reject these contentions.

The evidence of the alleged attempted murder of Donna Smith was admitted under section 190.3, factor (b), which provides for the admission at the penalty phase of "[t]he presence or absence of criminal activity by the defendant which involved the use of force or violence or the express or implied threat to use force or violence."

Defendant contends the evidence that he threatened Smith and later went to pick her up at her father's house established at most preparation for the crime of attempted murder, not attempted murder. In support, defendant cites the discussion of sufficiency of evidence for attempted robbery in *People v. Kipp* (1998) 18 Cal.4th 349 [75 Cal.Rptr.2d 716, 956 P.2d 1169]. It states that an attempted robbery has been committed "at the point" at which, "[i]f the transaction is interrupted . . . , no one would doubt that the defendant is guilty of an attempted robbery, because the actual or attempted use of force is sufficient to move the transaction beyond the sphere of mere preparation and into the zone of actual commission of the crime of robbery." (*Id.* at p. 377.) Defendant contrasts the situation described in *Kipp* with the evidence that he came to Smith's father's house at her request to drive her to New Mexico, and that he had with him firearms, including a .22-caliber pistol fitted with a silencer. Defendant suggests that notwithstanding his threats a month or so earlier to "whack" Smith or "put holes" in her or "shut [her] mouth permanently," the evidence did not show that "the transaction [had progressed] beyond the sphere of mere preparation and into the zone of actual commission of the crime" of murder. Assuming this is so, defendant cannot complain of any impropriety in the admission of the evidence of his threats to Smith and his arrival at her father's Grass Valley house trailer with firearms, because that evidence, whether or not sufficient to establish attempted murder, was independently admissible under section 190.3, factor (b) as showing, at least, "the express or implied threat to use force or violence." (See *People v. Jackson, supra,* 13 Cal.4th at pp. 1235–1236; *People v. Roberts* (1992) 2 Cal.4th 271, 332 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

In a related contention, defendant asserts that the admission during the penalty phase trial of his statements to Butte County and Colusa County authorities of his intent to kill Smith and bury her body in the desert violated the corpus delicti rule. That rule generally requires the prosecution to prove "the body of the crime itself" independent of a defendant's extrajudicial statements. (*People v. Alvarez, supra,* 27 Cal.4th at pp. 1168–1169 (*Alvarez*).) Assuming that the corpus delicti rule applies to unadjudicated crimes admitted as aggravating evidence (§ 190.3, factor (b)) at the penalty phase of a capital trial, defendant's contention must fail based on our recent decision in *Alvarez.*

In *Alvarez, supra,* 27 Cal.4th 1161, we considered the corpus delicti rule in light of the adoption by the California voters on June 8, 1982 of Proposition 8, adding section 28, subdivision (d) (section 28(d)), the "Truth-in-Evidence" provision, to article I of the California Constitution. We held: "[I]nsofar as the corpus delicti rule restricts the admissibility of incriminatory extrajudicial statements by the accused, section 28(d) abrogates it" for crimes committed after June 8, 1982. (*Alvarez, supra,* at p. 1174.) Here, the prosecution's evidence supporting the unadjudicated attempted murder of Donna Smith

took place between 1983 and 1987, after the voters adopted the Truth-in-Evidence provision. Accordingly, evidence of defendant's statements to authorities that he met Smith at her father's house trailer in Grass Valley on April 22, 1986, intending to kill her and bury her body in the desert, were properly admitted in evidence, regardless of whether the prosecution presented evidence of the crime of the attempted murder of Smith independent of defendant's incriminating statements. (*Alvarez, supra,* at p. 1174.)

As we acknowledged in *Alvarez, supra,* 27 Cal.4th 1161, "section 28(d) did not abrogate the corpus delicti rule insofar as it provides that every conviction must be supported by some proof of the corpus delicti aside from or in addition to [a defendant's incriminating] statements, and that the jury must be so instructed." (*Id.* at p. 1165, italics omitted.) But we stressed: "the modicum of necessary independent evidence of the corpus delicti . . . is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*Id.* at p. 1181.) Here, evidence of defendant's repeated threats to Smith, and his possession of firearms and a silencer when he arrived at Smith's father's Grass Valley house trailer after telling her to wait for him there alone was sufficient to permit an inference of injury, loss, or harm from a criminal agency. We therefore reject defendant's contention that the prosecution presented insufficient evidence of the corpus delicti of the attempted murder of Smith.

In any event, the jury already knew from the guilt phase that defendant had committed the murders of his fellow drug dealer Weber, his former girlfriend Duarte, and his high school friend Abono, and from the penalty phase the jury learned that he had killed his mother and had attempted to murder Al Redenius. Thus, defendant suffered no possible prejudice from the introduction of his own statements that he intended to kill Smith and bury her body in the desert. (See *People v. Jackson, supra,* 13 Cal.4th at p. 1232.) For the same reason, absence of any possible prejudice, defendant's claim of ineffective assistance of counsel must fail. (*Strickland v. Washington, supra,* 466 U.S. at p. 669.)

D. *Prosecution Expert's Comment*

Dr. Paul Berg, a clinical psychologist, was a prosecution witness at the penalty phase. Berg testified on rebuttal that defendant's homicidal conduct was attributable to his antisocial personality rather than to brain dysfunction or abnormality. When the prosecutor asked Berg to give examples of "the kind[s] of things" Berg had considered in reaching that conclusion, Berg responded: "Well, first of all, I considered the fact that other than the three

murders that he's been convicted of, that there's been a great deal of other violent behavior: Being hired, for example, to kill Al Redenius, admitting the planning of the killing of Donna Smith; *he talks about having killed someone when he was 16 years old.*" (Italics added.)

Defense counsel moved to strike Dr. Berg's reference to defendant's talking about killing someone when he was 16, and also sought a mistrial claiming, in part, that the prosecutor deliberately elicited the comment. The trial court denied the mistrial motion, but admonished the jury: "As to the statement about a murder committed by the defendant at the age of 16, you know about that. Not only is there no evidence before you of such an offense, none was ever charged and the defendant has no conviction for such an alleged offense."

Defendant now claims reversible error in the trial court's failure to grant a mistrial, and he renews his contention of prosecutorial misconduct. In addition, he argues that "the disclosure by Dr. Berg violated" Evidence Code section 352 and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We reject these contentions.

The comment by Dr. Berg was brief and made in the context of a capital trial at which the jury had already heard voluminous evidence of defendant's propensity for violence and homicidal behavior. The trial court instructed the jury not to consider the comment, so we assume it complied. (*People v. Pride, supra,* 3 Cal.4th at p. 240.) Furthermore, the record fails to support defendant's contention that the prosecutor deliberately elicited the comment.

E. *Prosecutor's Cross-examination of Defense Witnesses*

Claiming infringement of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, defendant seeks reversal of the death judgment based on three instances of the prosecutor's cross-examination of defense witnesses. Defendant concedes that the defense at trial did not object to any of these three instances. Thus, defendant has not preserved any of these claims. (*People v. Earp, supra,* 20 Cal.4th at p. 858; *People v. Price, supra,* 1 Cal.4th 324, 447.) In any event, they do not entitle him to relief.

The first instance involves the prosecutor's questioning of clinical psychiatry professor Dr. Donald Lunde about his evaluation of defendant. Questioned about whether he had taken into account defendant's murders of the victims in forming his opinion, Dr. Lunde testified: "What I have tried to present is my opinion about [defendant] as a human being as somebody who I am not saying he didn't do it or he didn't kill *some other people* or whatever." (Italics added.)

The following interchange then took place:

Prosecutor: "So you are not saying that [defendant] confessed to things he didn't do?"

Dr. Lunde: "No."

Prosecutor: "And you're not saying, you are not debating the verdict of this jury?"

Dr. Lunde: "No."

Prosecutor: "And you're not saying that he didn't murder some other people?"

Dr. Lunde: "It's possible."

Prosecutor: "Whatever your words were?"

Lunde: "Right."

Defendant asserts that the prosecutor's third question, picking up Dr. Lunde's words "some other people," was highly prejudicial because it would have suggested to the jury that defendant had killed people other than the four the penalty phase jury knew about in this case: Weber, Duarte, Abono, and Geraldine Sapp, defendant's mother.

The second instance of challenged prosecutor questioning pertains to defense witness Richard See, who was vice-principal of Clayton Valley High School when defendant was there at age 17. On direct examination, See mentioned that because defendant attended the school only briefly, he could recall "[j]ust one incident" involving defendant. On cross-examination, the prosecutor questioned See about the "one incident," and elicited testimony that "[l]aw enforcement [had] responded" to it, that defendant thereafter did not return to school, and that defendant "was a disciplinary problem."

The incident in question involved school officials' discovery of defendant and a female student behind the baseball field, both partially undressed, in possession of a controlled substance, and under the influence of some substance. The prosecution had sought to include this incident in its penalty phase case-in-chief, but the trial court ruled it inadmissible as not fitting within any category of aggravating evidence. Defendant argues here that the prosecutor's questioning of See about the incident violated the trial court's

express ruling, and also would have suggested to the jury (which never learned the specifics of the incident) that defendant had committed some serious crime at age 17.

Finally, defendant faults the prosecutor's cross-examination of Contra Costa County Probation Officer Thomas Bradshaw, who supervised the juvenile probation of defendant's brother, Danny. Bradshaw testified on direct examination about Geraldine Sapp's rancorous behavior. Because of that behavior, Bradshaw had removed himself from Danny Sapp's case, the only time he had taken such action in 32 years as a probation officer. Also on direct examination, Bradshaw mentioned that he had on three occasions supervised defendant on probation, and that the last of these was when defendant was committed to the California Youth Authority.

The prosecution's cross-examination of Bradshaw revealed that defendant had a lengthy juvenile probation file and that he had "bombed out of Boys' Ranch." Defendant asserts that this impermissibly invited the penalty phase jury to take into account that defendant's criminal history started when he was quite young.

Defendant further contends defense counsel was ineffective in failing to object to the above described questioning by the prosecutor of defense witnesses Lunde, See, and Bradshaw; in failing to warn See not to mention the Clayton Valley High School incident; and in failing to warn Bradshaw not to mention having been defendant's probation officer.

We are satisfied that defendant suffered no prejudice from the complained-of cross-examination. In light of the guilt phase evidence of defendant's cold-blooded murders of victims Weber, Duarte, and Abono, committed over more than a 10-year period, and the penalty phase evidence of defendant's murder of his mother, his shotgun blasts in the face of Al Redenius, and his death threats to and admissions of intending to murder Donna Smith, it is neither reasonably possible (*People v. Jackson, supra*, 13 Cal.4th at p. 1232) nor reasonably probable (*Strickland v. Washington, supra*, 466 U.S. at p. 669) that the penalty phase jury would have reached a different verdict had it not heard the particular interchanges between the prosecutor and the three defense witnesses in question.

F. *Evidence Suggesting Defendant Posed a Danger While Incarcerated*

Again claiming violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, defendant challenges certain testimony admitted during the prosecutor's redirect examination of two law enforcement witnesses, former Concord Police Officer James Blackburn and

Contra Costa County Deputy Sheriff Mike Dahlstrom. These contentions are not preserved for appeal because defense counsel did not object on federal constitutional grounds, raising only state law objections.

Officer Blackburn testified on direct examination that 20 years earlier, in 1971, defendant at age 18 was in possession of an illegal weapon, a sawed-off shotgun. Cross-examination by defense counsel established that Blackburn, who by the time of trial was living in Wyoming, had been reluctant to talk to defense investigators. Outside the jury's presence, Blackburn explained that when first contacted by the defense, he had cooperated, but he later refused to do so out of fear of harm to his family. Defense counsel argued that evidence of Blackburn's reasons for not cooperating would be more prejudicial than probative (Evid. Code, § 352), but the trial court ruled Blackburn's explanation admissible to "counteract any implications that were raised by the suggestion that he wouldn't talk to the defense." Back before the jury, the prosecutor asked Blackburn why he had been "reluctant to talk to the defense," Blackburn testified: "[B]ecause I feared basically for my family's life." No further explanation was given.

Defendant contends that the admission of the Blackburn explanation was reversible error. He further contends that defense counsel was ineffective in opening up the issue of Blackburn's reluctance to assist the defense. Defendant argues that counsel should have known that Blackburn and defendant had a "history."

The other law enforcement witness, Deputy Sheriff Dahlstrom, testified on direct examination he overheard defendant telling another inmate that the jail guards had found a shank in defendant's cell, and that it belonged to defendant. On cross-examination, defense counsel established that shanks were not uncommon in county jail, that defendant had not assaulted custodial staff or others, and that because defendant was housed in the county jail's administrative segregation unit, he was, like the other inmates in that unit, moved to a different cell every few days. On redirect, the prosecutor asked Dahlstrom if defendant was "finally transferred to another institution" after the guards found the shank. Defense counsel objected on relevance grounds, but the trial court overruled the objection." Deputy Dahlstrom then responded "Yes" to the prosecutor's question, adding that defendant was deemed "too dangerous for our facility," and thus was moved "per the Penal Code . . . to San Quentin Adjustment Center."

Defendant characterizes Deputy Dahlstrom's answer as impermissible evidence of defendant's future dangerousness. (See *People v. Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446] ["One can imagine few matters more prejudicial at the penalty trial than testimony . . . that defendant,

if sentenced to life without possibility of parole, would be likely to kill again."].) He further asserts that the prosecutor, by asking whether defendant was "finally" transferred to another facility, improperly suggested to the jury that defendant had a history of disciplinary problems in jail. Additionally, he faults counsel for not objecting to the question.

Assuming that it was error to allow the testimony of Officer Blackburn about fearing harm to his family, and the testimony of Deputy Dahlstrom that for safety reasons defendant was moved from county jail to San Quentin Prison, the errors were harmless. Defendant argues that this evidence went to the heart of the jury's penalty phase decision because it suggested that defendant posed a risk to others if sentenced to prison for life without possibility of parole. Defendant asserts that the jury would have understood fear by Officer Blackburn, who lived far away in Wyoming, to mean that defendant had the ability to exact vengeance even though incarcerated; and that the jury would have understood defendant's pretrial removal to San Quentin Prison, as described by Deputy Dahlstrom, to mean that defendant's possession of a common jailhouse weapon, a homemade knife, posed a unique danger to other jail inmates and to staff.

Maybe so. But the defense effectively countered any suggestion of defendant's future dangerousness through the expert opinion testimony of former California Department of Corrections Director Raymond Procunier that defendant, if sentenced to life without parole, would "behave himself" and "not cause . . . any problems." Moreover, evidence of Blackburn's fear of defendant and of defendant's pretrial removal to San Quentin added little to defendant's life of violence of which the jury was already aware. Therefore, it is neither reasonably possible (*People v. Jackson, supra*, 13 Cal.4th at p. 1232) nor reasonably probable (*Strickland v. Washington, supra*, 466 U.S. at p. 669) that the testimony by Officer Blackburn and Deputy Dahlstrom altered the jury's penalty verdict.

G. *Prosecutor's Argument*

Again claiming infringement of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, defendant cites these comments by the prosecutor in argument: "[L]est there be any misunderstanding or any suggestion to the contrary anywhere along the line, I believe there is but one appropriate decision in this case"; "[Y]ou will have to look a lot further and harder than I have been able to see to find that [defendant] is deserving of your mercy, or any of our mercy"; and "[This is] by far the most egregious case that this county has ever seen." Defendant contends these comments improperly stated the prosecutor's personal beliefs (see *People v. Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]), and would

have been understood by the jury as based on facts outside the evidence (see *People v. Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564]). He concedes that trial counsel did not object to the comments, but he asserts that no such objection was required because an admonition by the trial court would only "compound" the prejudicial effect of the comments. In the alternative, defendant asserts that defense counsel was ineffective in not objecting. We disagree.

As we have repeatedly held, a claim of prosecutorial comment generally requires an objection. (*People v. Earp, supra,* 20 Cal.4th at p. 858; *People v. Price, supra,* 1 Cal.4th at p. 447.) The rule is not otherwise when the claim challenges comments in a prosecutor's jury argument. (*People v. Benson* (1990) 52 Cal.3d 754, 795 [276 Cal.Rptr. 827, 802 P.2d 330].) In any event, the prosecutor's comments were not improper. In *People v. Benson,* where the prosecutor argued that the crime in that case was "perhaps the most brutal, atrocious, heinous crime . . . probably in this County [Santa Barbara], and very likely in this State," we concluded that "a reasonable juror" would have understood the prosecutor's comments as "obvious and altogether unobjectionable" expressions of "the People's position that defendant's crimes called for the ultimate sanction." (*Id.* at pp. 794–795.) So too here.

## H. *Defendant's Letter to Michael Weber*

Defendant seeks reversal of the death judgment based on three sentences in a letter defendant wrote to Weber's brother Michael. At the guilt phase, Michael Weber read the letter to the jury, and the letter itself was admitted in evidence. During guilt phase deliberations, the jury asked to see the letter, and the trial court granted that request. At the close of the penalty phase, the trial court instructed under CALJIC No. 8.85 that jurors in penalty phase deliberations could consider all evidence presented at both phases of the trial unless otherwise instructed. The court did not instruct jurors to disregard defendant's letter to Michael Weber.

Defendant's letter to Michael Weber, quoted in full on pages 248–249, *ante,* stated that defendant's role in the Weber killing was as a "tool" used by "other people." The three sentences defendant now objects to are these: "After I'm executed or if I am executed those 'other people' will still be out there. Sometimes I wish they would be executed right along beside me. They deserve it *also* in my opinion." (Italics added.)

Defendant contends that the three sentences conveyed to penalty phase jurors that defendant thought he deserved to die for Weber's murder. This, he asserts, violated the federal Constitution's Fifth, Eighth, and Fourteenth Amendments in addition to California law because a capital defendant's

"opinion regarding the appropriate penalty" for his crimes "[is] irrelevant to the jury's penalty decision." (*People v. Danielson* (1992) 3 Cal.4th 691, 715 [13 Cal.Rptr.2d 1, 838 P.2d 729]; see *Johnson v. Mississippi* (1988) 486 U.S. 578, 585 [100 L.Ed.2d 575, 108 S.Ct. 1981].) Defendant also claims a violation of the Sixth Amendment right to effective assistance of trial counsel because his lawyers failed to object to the jury's hearing and seeing the three sentences in the letter. According to defendant, the three sentences "prejudicially skewed the penalty determination," which he asserts was close because the jury deciding penalty "struggled for three days."

Because there was no objection to permitting penalty phase consideration of the three sentences in defendant's letter to Weber, the issue of trial court error has not been preserved. In any event, it lacks merit as does defendant's claim of ineffective assistance of trial counsel. Only a strained reading of the quoted passage, overemphasizing the word "also," might support an inference that defendant thought everyone responsible for the Weber killing deserved the death penalty. The gist of the entire letter, however, was a threat to Michael Weber that notwithstanding that defendant was in custody and could be executed, "other people" responsible for his brother's murder "will still be out there." Considered in that context, jurors would have understood that phrase to mean that those other people shared with defendant equal responsibility for killing Weber, not that defendant, who by presenting a substantial case in mitigation was actively fighting a death verdict, truly believed that he deserved to die.

## I. *Penalty Phase Instruction*

### 1. *Consideration of unadjudicated crimes*

In *People v. Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673], we held that the trial court at the penalty phase had no obligation to instruct the jury, without request, that it "should not use the 'inference of criminal propensity drawn from proof of one incident of unadjudicated conduct as proof of the truth of the allegations of another such incident.' " (*Id.* at p. 49.) We explained that a trial court, as a general rule, "owes no obligation to instruct on the limited purposes for which evidence of prior crimes is admissible." (*Ibid.*) We rejected the defendant's contention that this general rule should not apply to the penalty phase of a capital trial in light of the trial court's instruction "that (1) evidence of various specified criminal acts had been presented, (2) before the jury could use evidence of any such offense as an aggravating circumstance, it must find beyond a reasonable doubt that such offense occurred, and (3) except for such offenses, the jury 'may not consider any evidence of any other criminal acts as an aggravating circumstance.' " (*Id.* at pp. 49–50.)

Here, the trial court's instruction to the jury was substantially similar to the one at issue in *People v. Johnson, supra,* 6 Cal.4th 1.[4] Defendant seeks to distinguish *Johnson* on the ground that it addressed only the use of *unadjudicated* criminal offenses to show criminal propensity but not the use of *adjudicated* criminal offenses for that purpose. Defendant observes that the jury had already convicted him of the first degree murders of Weber, Duarte, and Abono. He suggests that without a limiting instruction, the jury may well have considered evidence of his commission of those murders as showing his *propensity* to commit murders, in determining whether he had committed the unadjudicated murder of his mother and attempted murders of Al Redenius and Donna Smith. He points to the prosecutor's argument to the jury comparing defendant's behavior in the adjudicated murders with his behavior in the unadjudicated murder of his mother. For instance, the prosecutor argued that lying about the death was "typical" of defendant. "[A]s he has done with Liz Duarte and others, [defendant] started fabricating his defense, creating something out of nothing." And the prosecutor pointed out that like other murders committed by defendant, the murder of his mother had a financial motive because he owed his mother over $60,000.

In addition, defendant faults trial counsel for not seeking a limiting instruction and for not objecting to the prosecutor's comparison of the adjudicated offenses to the unadjudicated offenses. According to defendant, when considered together, the absence of a limiting instruction, the prosecutor's arguments, and defense counsel's failings violated the federal Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments. We reject these contentions.

In *People v. Lang* (1989) 49 Cal.3d 991 [264 Cal.Rptr. 386, 782 P.2d 627], we held that "in the absence of a request, the trial court is under no duty to give [a limiting] instruction at the penalty phase in regard to evidence received at the guilt phase." (*Id.* at p. 1039; accord, *People v. Zapien, supra,* 4 Cal.4th at p. 993.) Here, with no request, the trial court had no obligation to

---

[4] In accord with CALJIC No. 8.87 (1989 rev.) (5th ed. 1988), the trial court instructed the jury on the unadjudicated criminal offenses: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts or activity: The attempted murder of Donna Smith[;] The attempted murder of Al Redenius[;] The murder of Geraldine Sapp[;] possession of a shank in a county jail[;] possession of a sawed-off shotgun which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts or activity. A juror may not consider any evidence of any other criminal acts or activity as an aggravating circumstance. It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

instruct the jury not to consider evidence supporting the adjudicated murders in determining whether defendant had committed the unadjudicated crimes.

Moreover, Evidence Code section 1101, subdivision (b) allows for the admission of evidence of other crimes committed by a defendant to show factors such as motive, intent, identity, or absence of mistake or accident with respect to a charged crime. The prosecutor's penalty phase argument, as highlighted by defendant, focused on aspects of the killings of Weber and Duarte that bore a substantial similarity to the killing of defendant's mother: In each instance, defendant was motivated by financial gain and immediately set out to create a false alibi. Because the jury properly could consider the adjudicated murders for such purposes in determining whether defendant had committed the unadjudicated crimes, no limiting instruction on propensity evidence was warranted, and defense counsel thus cannot be faulted for not requesting one or not objecting to the prosecutor's argument.

### 2. *Instruction on unadjudicated crimes*

Citing the wording of the instruction quoted in footnote 4, *ante*, defendant claims a deprivation of rights guaranteed under the federal Constitution's Fifth, Sixth, and Fourteenth Amendments, thus requiring reversal of the death judgment. Specifically, defendant points to the instruction's listing of the unadjudicated criminal activity (the attempted murders of Smith and Redenius, the murder of defendant's mother, and the possession of a shank in county jail and of a sawed-off shotgun) followed by the phrase "which involved the express or implied use of force or violence or the threat of force or violence." This formulation, according to defendant, told the jury that each listed instance of unadjudicated criminal activity actually involved force or violence, and thus "directed [a] verdict on an essential element of the factor (b) finding." Defendant concedes that two of the incidents, the murder of defendant's mother and the attempted murder of Redenius, if accepted by the jury, clearly involved force or violence. But he disputes that his actions toward Smith had "crossed the line into attempted murder," and that his possession of a shank in jail or his earlier possession of a sawed-off shotgun in his home at age 18 involved express or implied use of force or violence or the threat to use force or violence. We discern no instructional error.

CALJIC No. 8.87, as given by the trial court, instructed the jury that "Evidence has been introduced for the purpose of showing" that defendant had committed the specified unadjudicated criminal acts involving force or violence. It further said that "[b]efore a juror may consider any of such criminal acts or activity as an aggravating circumstance, a juror must be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts or activity." In addition, the trial court instructed the jury

as follows: "You must not consider as an aggravating circumstance any evidence or alleged criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the use of threat or implied [*sic*] to use violence."

These instructions, considered together, properly told the jurors that they could consider any of the specified unadjudicated criminal acts as factors in aggravation only if they found beyond a reasonable doubt that defendant had committed the act or activity, and that it involved the use or attempted use or express or implied threat to use force or violence.

### 3. Constitutionality of CALJIC No. 8.85

At the close of the penalty phase, the trial court instructed in accord with CALJIC No. 8.85 on the factors under section 190.3 that jurors could consider in deciding the penalty to be imposed.[5] Defendant objected to the instruction on three grounds: First, he asked the court to delete as irrelevant to his case any mention of section 190.3, factors (e) (victim participant in killing), (f) (defendant's reasonable belief in moral justification), (g) (defendant under extreme duress or substantial domination) and (j) (defendant was accomplice and minor participant). Second, he objected to the "whether or not" formulation in section 190.3, factors (d) (defendant acted under the influence of extreme mental or emotional disturbance), (e), (f), (g), (h) (defendant suffered

---

[5] "In determining which penalty is to be imposed on the defendant, you . . . shall consider, take into account and be guided by the following factors, if applicable. [¶] (a) The circumstances of the crimes of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true. [¶] (b) The presence or absence of criminal activity by the defendant, other than crimes for which he has been tried in the present proceeding, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings. [¶] (d) Whether or not the offense committed while defendant was under the influence of extreme mental or emotional disturbance. [¶] (e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] (g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person. [¶] (h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as the result of mental disease or defect. [¶] (i) The age of the defendant at the time of the crime. [¶] (j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor. [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." (CALJIC No. 8.85.)

from a mental disease or defect) and (j). And third, he objected that the instruction failed to tell the jury that section 190.3, factors (d), (e), (f), (g), (h), (j), and (k) (other extenuating circumstances) can only be mitigating.

Defendant contends this instruction violated California law as well as the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He concedes that we have rejected previous challenges to a trial court's determination not to delete factors or to delineate which are aggravating and which are mitigating. (See *People v. Dennis* (1998) 17 Cal.4th 468, 552 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Benson, supra,* 52 Cal.3d at pp. 802–803.) But he argues that the trial court's refusal to delete the purportedly irrelevant factors allowed the prosecutor to "go down the list" and exclaim that it would be "ludicrous" for the jury to find as mitigating factors that a victim was a participant (§ 190.3, factor (e)), or that defendant's participation in the offenses was relatively minor (§ 190.3, factor (j)). Contrary to defendant's argument, there was nothing improper in the prosecutor's comments. The prosecutor did not, for instance, suggest that the absence of mitigating factors was aggravating. (See *People v. Davenport* (1985) 41 Cal.3d 247, 289, [221 Cal.Rptr. 794, 710 P.2d 861].) Rather, he told the jury that section 190.3, factors (a), (b), and (c) were aggravating, but that "[i]n mitigation, you can consider all of the rest." The prosecutor then suggested that it would be "ludicrous" to find as mitigation in this case victim participation or defendant playing a relatively minor role. This was fair comment on the evidence, which included defendant's contention in his confession that murder victim Duarte had asked him to shoot her, and defendant's description in his letter to Weber's brother Michael of his own role in killing Weber as a "tool" of others. Thus, we see no reason to reconsider our holdings in *People v. Dennis, supra,* 17 Cal.4th at page 552, and *People v. Benson, supra,* 52 Cal.3d at pages 802–803.

With respect to the "whether or not" formulation mentioned earlier, defendant contends it invited the jurors to consider "whichever" of two possibilities was shown by the evidence, and thus that a juror who found a factor not proven could use that as a factor favoring imposition of the death penalty. This is simply a variation of the arguments we rejected in *People v. Dennis, supra,* 17 Cal.4th 468, 552, and *People v. Benson, supra,* 52 Cal.4th 754, 802–803, and we likewise reject it. In any event, here there was no possibility that a juror would have used an unproven factor as one favoring death because in addition to instructing on CALJIC No. 8.85, the trial court gave this instruction: "You are not required to limit your consideration of mitigating circumstances to these specific factors. [¶] You may also consider any evidence presented during the trial as reasons for not imposing the death sentence. [¶] You are not permitted to consider any factor as aggravating unless it is specified on the list of factors you have been given. [¶] There is, however, no limitation on what factors you may consider as mitigating. [¶]

*The absence of a mitigating factor is not and cannot be considered by you as an aggravating factor.*" (Italics added.)

In a related argument, defendant claims constitutional error because the jury would have understood the instruction on section 190.3, factor (d) as precluding juror consideration of evidence of defendant's mental or emotional disturbance "that was less than extreme." We have previously rejected this contention, explaining that the instruction under section 190.3, factor (k) allows the jury to consider " 'a mental condition of the defendant which, though perhaps not deemed "extreme," nonetheless mitigates the seriousness of the offense.' " (*People v. Wright* (1990) 52 Cal.3d 367, 443–444 [276 Cal.Rptr. 731, 802 P.2d 221], quoting *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250]; accord, *People v. Jones* (1997) 15 Cal.4th 119, 190 [61 Cal.Rptr.2d 386, 931 P.2d 960].) We therefore do not reconsider it. In any event, there was no possibility of juror confusion in this case because of the trial court's instruction under CALJIC No. 8.85, discussed above.

## J. *Cumulative Effect of Any Errors*

Defendant asserts that the cumulative effect of errors at the guilt and penalty phases compels reversal of the death judgment. We disagree. We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors.

## K. *Constitutionality of Death Penalty Statute*

Defendant challenges various aspects of California's capital sentencing scheme as violating the federal Constitution. We have in previous decisions rejected essentially these same challenges and decline to reconsider them here.

 The law is not unconstitutional because it permits the jury to consider unadjudicated offenses as aggravating evidence (see *People v. Bolin* (1998) 18 Cal.4th 297, 335 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Samoya* (1997) 15 Cal.4th 795, 863 [64 Cal.Rptr.2d 400, 938 P.2d 2]), because it fails to require unanimous jury agreement before consideration of an aggravating factor (*People v. Bolin, supra*, at pp. 335–336), or because it does not require jury findings on aggravating factors (*People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Lucero* (2000) 23 Cal.4th 692, 741 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Fauber* (1992) 2 Cal.4th 792, 859 [9 Cal.Rptr.2d 24, 831 P.2d 249]). There is no constitutional requirement that aggravating factors be proven beyond a

reasonable doubt, that aggravating factors be proven to outweigh mitigating factors beyond a reasonable doubt, or that the jury find that death is the appropriate punishment beyond a reasonable doubt. (*People v. Bolden, supra,* at p. 566; *People v. Barnett* (1998) 17 Cal.4th 1044, 1178 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Bradford, supra,* 14 Cal.4th at p. 1059.) "Because the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt," the federal Constitution does not require the prosecution to bear the burden of proof or burden of persuasion at the penalty phase. (*People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376]; accord, *People v. Bemore* (2000) 22 Cal.4th 809, 859 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

The law is not unconstitutional because prosecutors may select, from among the class of death-eligible cases, those in which the death penalty will actually be sought (*People v. Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1024 [30 Cal.Rptr.2d 818, 874 P.2d 248]), because the law does not presume that life without parole is the appropriate sentence (*People v. Bolden, supra,* at p. 566; *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]), or because this court does not require intercase proportionality review (*People v. Bolden, supra,* at p. 566; *People v. Crittenden, supra,* at p. 156, 36 Cal.Rptr.2d 474, 885 P.2d 887; *People v. Hayes, supra,* at p. 645).

The law does not fail to adequately narrow the class of murders for which the death penalty can be imposed. (*People v. Bolden, supra,* at p. 566; *People v. Barnett, supra,* 17 Cal.4th at p. 1179; *People v. Arias, supra,* at p. 187.)

## CONCLUSION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 15, 2003, and the opinion was modified to read as printed above. Baxter, J., did not participate therein.